RYAN, Plaintiff in error, vs. THE STATE, Defendant in error.

*September 27—November 11, 1902.*

*Criminal law and practice: Examination of jurors: Homicide: Evidence: Instructions to jury: Reasonable doubt: "Heat of passion": Apparent danger: Justifiable and excusable killing.*

1. Upon the examination of a juror on his *voir dire* it was not error to exclude a question as to whether he knew that the defendant in a criminal case was entitled to the benefit of the presumption of innocence, since that called upon him to anticipate the instructions to be given by the court.

2. Upon such examination it was not error to exclude questions as to whether the juror, if selected, would give defendant the benefit of the presumption of innocence throughout the trial and until he had heard all the evidence, and whether he could and would wait until he had heard all the evidence before making up his mind; although perhaps it would have been better practice to allow the juror to answer them.

3. Upon a trial for murder it was not error to refuse to allow a physician to testify as to the effect, upon a man suffering from heart disease, of a sudden blow upon the heart or body or of being compelled to engage in a scuffle or struggle while angry, or as to the likelihood of heart disease terminating suddenly or fatally—it not having at that time been shown that defendant had heart disease, and there being subsequent uncontradicted testimony covering substantially the same ground.

4. A charge to the jury that, "in passing upon the question as to what degree of homicide the defendant is guilty, if you have a reasonable doubt as to whether it should be a higher or a

lower grade, you are to give him the benefit of the doubt and return a verdict of guilty of the lower offense rather than the higher," is *held* not to have had a tendency to mislead the jury to believe that if they had a reasonable doubt as to the existence of either of two grades of offense they should convict of the lesser,—especially in view of the charge immediately following, that they could not convict of any degree of criminal homicide if they had a reasonable doubt of his guilt.

5. Although a charge defining reasonable doubt as "such a doubt as would cause a reasonably prudent man to pause, *or deter him* from acting or deciding, in the most important affairs of life," is open to criticism, yet the error is *held* not such as should work a reversal, where that charge was followed by an instruction, given at defendant's request, that if "a doubt as to defendant's guilt arises in your mind, which would lead you *to pause and hesitate* to conclude in the affirmative concerning the most important affairs of life, you have a reasonable doubt of defendant's guilt and you should acquit him."

6. It was not such an error as should work a reversal to charge the jury,. on a trial for murder, that the case was a very important one; that "on the one hand stands the commonwealth of Wisconsin, demanding that its laws shall be executed, that crime shall be punished; and representatives of the people are asking at your hands a verdict of guilty of whatever offense you may find the evidence to warrant." This was not equivalent to saying that the state had already decided the defendant's guilt of some degree of homicide, and that the state demanded a verdict of guilty.

7. After defining manslaughter in third degree as in sec. 4354, Stats. 1898, it was proper to charge the jury that "heat of passion means something more than mere anger or irritation. It means that at the time of the act the reason is disturbed or obscured by passion to an extent which might render ordinary men, of fair average disposition, liable to act rashly, or without due deliberation or reflection, and from passion rather than judgment."

8. Respecting justifiable homicide the court charged that "the taking of human life is a matter of such serious import that it cannot be justified by only slight danger. The danger which will justify the killing of a human being must be actual, present, and urgent to the apprehension of the defendant. Anything less than this will not suffice to justify one human being in taking the life of another." *Held*, that this was not open to the objection that it included only danger which *existed in fact* and was also present and urgent to the apprehension of the de-

fendant, especially as the jury had just been instructed, at de-
fendant's request, that it was sufficient if defendant had a rea-
sonable belief of danger of losing his life or of suffering great
bodily harm, "although the danger was not real—only appar-
ent."

9. Upon the evidence—tending to show, among other things, that
defendant had reasonable ground to apprehend a design on the
part of the deceased to commit a felony upon him or to do him
some great bodily harm; that just before the shooting he had,
by drawing a revolver, stopped deceased from violently advanc-
ing upon him; that when deceased was in the act of making an-
other violent and threatening assault, defendant drew the re-
volver a second time, hoping to deter deceased from advancing
further; that, not knowing the revolver was cocked, and with-
out taking aim, he pointed it toward deceased, then about eight
feet away, and told him to stop or he would shoot, but without
any intention of shooting; and that the revolver was then dis-
charged, causing death—it is *held* that the jury might have
found the homicide excusable, as having been "committed by
accident and misfortune" in doing a "lawful act by lawful
means with usual and ordinary caution and without any unlaw-
ful intent" (sec. 4367, Stats. 1898), and that it was error not
to submit that question to the jury.

ERROR to review a judgment of the circuit court for Sha-
wano county: JOHN GOODLAND, Circuit Judge. *Reversed.*

The plaintiff in error was charged with having, on Decem-
ber 1, 1901, wilfully, feloniously, and maliciously killed and
murdered one Frank O'Brien in a saloon at Antigo, and at
the close of the trial therefor was convicted of manslaughter
in the fourth degree, and on May 29, 1902, was sentenced by
the court to the state's prison at Waupun for the period of
two years.   On behalf of the attorney general, it is conceded
that the evidence tends to prove the facts and circumstances
attending the killing, substantially as stated in the brief of
counsel for the accused, and is to the following effect:

*Ryan* lived at Summit Lake, some twenty miles distant
from Antigo, and was a farmer and jobber.   He was a nerv-
ous man about fifty years of age, and weighed between 145
and 150 pounds, and was afflicted with heart disease of long

standing, and had for several weeks prior to the killing been deprived of rest and sleep in caring for a daughter dangerously sick of pneumonia, besides having the care and responsibility of his logging operations and a camp of about forty men. He was physically and mentally worn out and exhausted, and in a very nervous condition. On November 30, 1901, he returned home from camp on Saturday evening, and found it necessary to drive to Antigo, which place he reached about 11:30 p. m. An attempt had been made a few evenings before by two men to hold him up while returning home from camp, and so on starting for Antigo he concluded to take his revolver. Finding nothing in it, however, but four empty shells, he determined to buy at Antigo a box of cartridges. He retired on that Saturday night at Antigo about 1 o'clock, and arose between 5 and 6 o'clock a. m. On Sunday afternoon he did some shopping, looked after the hiring of some men, attended to some other business, and about noon met one Lewis,—an acquaintance,—the owner of a hardware store, whom he asked if he had his key to the store, saying that he wanted to buy a box of cartridges. Lewis procured the box of cartridges, gave them to *Ryan,* who then went to the store of one Krum to get some goods he had purchased there earlier that day, and while in the store *Ryan* took the empty shells out of his revolver, and loaded it. While so engaged, one of the clerks noticed that the revolver was a peculiar old make, and he and *Ryan* had some conversation about it. The revolver was an old-style Smith-Weston make, and was not a self-cocker, and *Ryan* always cocked it to load. When cocked, the hammer lay back flat upon the handle, and was not nearly so prominent as when not cocked. *Ryan* had no recollection of having cocked it at all, and though several of the witnesses saw him draw the revolver in the saloon none saw him cock or attempt to cock it.

After dinner, *Ryan* prepared to go home, and had his team

hitched, and while driving along the street saw a Mr. Edick, with whom he had some business, standing by the saloon where the shooting occurred. *Ryan* tied his team and went to the saloon, where he met Edick, and then called Edick out back of the saloon, where he and Edick transacted their business. Thereupon *Ryan* said to Edick that he was going home, that he did not feel well, and that he was going to take a glass of wine; and asked Edick to join him. They went into the saloon, had their wine, and while change was being made the deceased, Frank O'Brien, and one Reilly came in. *Ryan* called to O'Brien to come and have something, saying that the change was not made yet, and then shook hands with O'Brien, who shared in *Ryan's* treat; and some conversation of a friendly nature followed. O'Brien was a freight conductor, a strong athletic young man thirty-eight years of age, and stood six feet and weighed 185 pounds, and was at the time under the influence of liquor and ugly and abusive. Soon after O'Brien and Reilly came in, *Ryan* said: "Well, I will have to bid you good-bye, boys; I have quite a ways to go." O'Brien asked him where he was going. *Ryan* told him that he was going home. O'Brien then said: "Take something to drink with me, *Phil,* before you go." *Ryan* declined, and O'Brien persisted; finally, *Ryan* took a cigar, and was about to go when O'Brien again stopped him, saying that he would sing an Irish song. The inattention given to O'Brien while singing did not please him, and so he stopped, and said: "If you do not listen to me. I won't finish it." *Ryan* said: "Some body else was talking; sing it again, Frank." O'Brien said he would not do so, and invited *Ryan* to take some more drink. *Ryan* declined, and said he did not know that O'Brien was so good a singer; that he knew he could play the fiddle; and that he was all right. O'Brien then said that *Ryan* would be all right if he was not a crank. *Ryan* told him he had never been a crank with him. O'Brien then said: "No, but you are a crank with your family."

*Ryan* said he was talking about something he did not know anything about. O'Brien then said: "Well, what do you live with your wife for if you think she is a whore ?" *Ryan* said he never said so, that he would quit O'Brien then, as he was looking for trouble, and walked over to the window to the side of the saloon, and stopped there. From that moment on, to the time of the shooting, O'Brien heaped upon *Ryan* a torrent of abuse, using towards him the most vile, opprobrious, and degrading epithets, without any cause or provocation on *Ryan's* part.

*Ryan* was then standing from twenty-five to thirty feet distant, southeasterly from O'Brien and the bar. The saloon fronted north. The front door was closed; the bar was on the west side; the stove and two tables occupied a position near the middle of the room but south of the bar. O'Brien advanced to where *Ryan* was, and demanded that he come and drink. *Ryan* refused. O'Brien caught *Ryan* with much violence, threw him against the east wall, saying that he would make him drink, then pulled him across the floor to the bar, and said: "I will make you drink whisky, you damn crank. Anschultz [bartender], give me that bottle, and I will make him drink it." *Ryan* was all the time trying to release himself, broke away, and went and sat down by a table about thirty feet distant. O'Brien for a short time remained standing near the bar, all the while abusing *Ryan*. He called him a damn son of a bitch of a crank, and said that he ought not to have a family, etc., insisting that *Ryan* should come up and drink. Then O'Brien advanced the second time toward where *Ryan* was sitting. *Ryan* said to him: "Go away now, Frank, and let me alone; I don't feel well—quit." Instead of doing so, O'Brien seized *Ryan,* yanked him out of his chair, and against the slot machine on the east side of the wall of the building; then dragged him toward the bar. Finally, *Ryan* said to him, "Leave me alone, and I will walk to the bar." O'Brien again insisted that *Ryan* should drink

whisky. *Ryan* refused, broke loose, and backed away from O'Brien. O'Brien followed him up saying, "You cowardly son of a bitch, I will make you come up." *Ryan* pulled his revolver, intending, as he claims, to scare O'Brien, and deter him from further violence, saying: "Now stop! I have taken more abuse from you than I did from any man in my life. I don't want to hurt you or the family; let me alone. I will let you go this time. I don't want to make any trouble for your family; I have enough of my own." O'Brien then stopped; went back to the north end of the bar; stood there for a moment with his right arm resting on the bar, facing *Ryan*. At that instant Anschultz came from behind the bar, and said to *Ryan*, "*Phil*, give me that revolver." *Ryan* said, "No, I won't give you the revolver. I am making no trouble. Why don't you stop the man who is making the trouble?" Then Anschultz went away from *Ryan*, and made an effort to catch the gun. *Ryan* told him to keep away, and not to interfere with him, and he went and sat down in a chair. O'Brien stood for a moment at the bar, continuing his abuse of *Ryan*, and said: "You God damn son of an Irish whore, I will come down and knock your head off." And he then started toward *Ryan*, and the color in his face changed to a deathly pale, as though he was mad. *Ryan* said, "I knew he was going to lick or pound me; I was satisfied of that." When O'Brien came near him, he stood up, drew his revolver, and without taking aim leveled it toward O'Brien. They were then about seven or eight feet apart, and he told O'Brien to stop, or he would shoot. *Ryan* testified that he did not know that the revolver was cocked; that he had no recollection of having cocked it, and had no intention of discharging it; that he did not mean to shoot O'Brien; that he held the gun over his head; that he did not take aim; that he did not intend to discharge the revolver at the time it went off; that he never had any thought of discharging it, and did not know it was cocked; that he knew he could not cope with O'Brien

any way; that he was all choked up,—nervous and worked up; that his heart bothered him so that he could hardly breathe; that when O'Brien came toward him the second time, after the tussle with him, his heart was all worked up; that he felt weak; that his heart was pounding so he could hardly stand up; that he was nervous anyway, and thought O'Brien would hurt him; that when he went back he knew O'Brien was mad, and he was afraid O'Brien would hurt him; that he held the gun so O'Brien could not pitch onto him; that he and O'Brien had always, up to that time, been particular friends.

After the shooting, *Ryan* stayed in the saloon until arrested. He cried, and expressed regret for what had happened. None of the several persons in the saloon during the trouble made any effort to interfere, nor did they at any time make the least effort to quiet O'Brien or dissuade him from his course.

For the plaintiff in error there was a brief by *T. W. Hogan* and *P. H. Martin,* and oral argument by *Mr. Martin.*

For the defendant in error there was a brief by the *Attorney General,* and oral argument by *R. F. Hamilton,* second assistant attorney general.

CASSODAY, C. J.  1. Error is assigned because one of the jurors, on being examined upon his *voir dire,* and after answering to the effect that if he should be selected as a juror in the case he supposed he would take the law from the court as it should be given to him, and abide by it as best he could, was asked three several questions, to each of which an objection was sustained; and which questions were as to (1) whether the juror knew that the defendant in a criminal case is entitled to the benefit of the presumption of innocence; (2) and whether, if selected as a juror in the case, he would give the defendant the benefit of the presumption of innocence throughout the trial, and until he had heard all the

evidence; (3) and whether, if selected as such juror, he could and would wait until he had heard all the evidence before making up his mind. The first of these questions called upon the juror to anticipate the instructions to be given by the court, and was properly excluded. Perhaps it would have been better practice to have allowed the juror to have answered the second and third questions, but we cannot hold that their exclusion was reversible error. This court has recently held that "questions which practically ask a juryman what he would or would not do under a supposed state of facts may properly be ruled out." *Hughes v. State,* 109 Wis. 398, 85 N. W. 333.

2. Error is assigned because a physician, called as a witness by the defendant, was not allowed to testify as to the effect upon a man suffering from heart disease of a sudden blow upon the heart or body, or of being compelled to engage in a scuffle or struggle while angry, or to state one of the characteristics of heart disease with reference to its terminating suddenly or fatally. At the time of excluding such testimony, it did not appear in proof that *Ryan* had heart disease at the time of the killing in question, although his counsel did state that he would show that he had had heart trouble for some years. The witness was, however, allowed to testify that he had examined *Ryan* the night before he was testifying; that he found he had heart trouble; that it would be impossible for him to state how long it had existed; that the effect of a struggle or overexertion or excitement upon a person afflicted with such trouble would be great prostration and feeling of tightness across the chest,—of choking, weakening; that excitement alone would produce such conditions, and so would a sudden scare,—intense anger,—and a struggle would intensify it. *Ryan* afterwards testified to the effect that he had suffered from heart trouble for fifteen or sixteen years; that he had consulted a physician for it, and had taken medicine; that he had repeatedly had spells of prostration and

collapse; that he had been advised by his doctors as to the effect of heart disease, and its likelihood to terminate suddenly and fatally if he became very excited, and that he knew it without advice; and further as mentioned in the statement of facts. Such testimony of *Ryan* was uncontradicted. In view of such uncontradicted evidence, and in view of the fact that such exclusion of the testimony of the physician was before there was any evidence in the case that *Ryan* had heart disease at the time of the killing, we cannot hold that it was reversible error to exclude such testimony.

3. Exception is taken because after charging the jury as to the presumption of innocence "in favor of the defendant as to each and every element of the offense charged," and that they must acquit unless the state established "by the evidence the existence of each and every element of the particular offense, and the defendant's guilt thereof, beyond all reasonable doubt," the court further charged the jury:

"So, too, in passing upon the question as to what degree of homicide the defendant is guilty, if you have a reasonable doubt as to whether it should be a higher or lower grade you are to give him the benefit of the doubt and return a verdict of guilty of the lower offense rather than the higher, provided, as I have said, you have a reasonable doubt."

This language is construed by counsel to mean that, if the jury had a reasonable "doubt as to the existence of either of the two grades of offense," then the defendant was to get "the benefit of the doubt by convicting him of the lesser" offense. The language may be a little unguarded, but it is obvious that the court was seeking to inform the jury that in case they failed to acquit the defendant under the circumstances already given, and had a reasonable doubt as to whether the offense was of a "higher or lower grade," then he was to have the benefit of the doubt, and to convict "of the lower offense rather than the higher." This is obvious from what immedi-

ately follows in the charge, to the effect that they could not convict "of any degree of criminal homicide" if they had a reasonable doubt of his guilt; and then the court said: "It is your duty to either acquit the defendant, or to find him guilty of the lowest degree of criminal homicide submitted with which you can reasonably reconcile the facts admitted or so established." Such charge was given at the request of the accused. We cannot say that the jury were misled by the instruction as thus given.

4. Exception is taken to the following portion of the charge:

"A reasonable doubt is a doubt which, as the term implies, is founded on reason,—some reason that to your mind is sufficient to support a doubt. It is not a mere conjecture. It is not that there is a possibility that the case may be different, but must be such a doubt as would cause a reasonably prudent man to pause, or *deter him* from acting or deciding, in the most important affairs of life."

Such use of the word "deter" is certainly unfortunate. But such instruction was followed by another instruction, given at the request of the accused, as follows:

"You should, in your consideration and conclusion, reject every alleged fact or inference not so established beyond all reasonable doubt; then if upon all the established facts, or lack of facts, a doubt as to defendant's guilt arises in your mind, which would lead you *to pause and hesitate* to conclude in the affirmative concerning the most important affairs of life, you have a reasonable doubt of defendant's guilt and you should acquit him."

This clause characterized the meaning to be given to the word "deter" as used in the previous instruction, and cured the error, or at least prevented it from being reversible error. *Butler v. State,* 102 Wis. 364, 369, 78 N. W. 590; *McAllister v. State,* 112 Wis. 496, 503, 88 N. W. 212.

5. Exception is taken because the court said to the jury:

"Of course it is not necessary for me to say to you that this is a very important case. On the one hand stands the commonwealth of Wisconsin, demanding that its laws shall be executed, that crime shall be punished; and representatives of the people are asking at your hands a verdict of guilty of whatever offense you may find the evidence to warrant."

This was a mere general observation, calculated to impress upon the jury the importance of the responsibility resting upon them. It might better have been omitted; but it is not "equivalent to saying that the state had already decided the defendant's guilt of some degree of homicide," and "that the state demanded a verdict of guilty," as claimed by counsel. Such a verdict was only to be rendered in case the jury found "evidence to warrant" the same under the instructions given. We cannot base a reversal upon such portion of the charge.

6. Exception is taken because after defining manslaughter in the third degree, and emphasizing the fact that to convict of that offense the killing must have been done in the heat of passion, without design to effect death, by a dangerous weapon, and not justifiable nor excusable under the laws of this state, the court further charged the jury:

"The heat of passion, in this definition, means something more than mere anger or irritation. It means that at the time of the act the reason is disturbed or obscured by passion to an extent which might render ordinary men, of fair average disposition, liable to act rashly, or without due deliberation or reflection, and from passion rather than judgment."

The precise objection to this portion of the charge is that it does not make the guilt of the accused turn upon his own heat of passion, but upon the heat of passion of "ordinary men of fair average disposition." True, the accused alone was on trial, but the deceased was a party to the controversy which led to the killing. A learned textwriter, speaking upon the subject, says:

"In general, provocation consists in circumstances of such nature as are calculated to produce, and do produce, such excitement and passion as might obscure the reason of an ordinary man, and render him liable to do the act which causes the homicide. . . . The provocation should be sudden and sufficiently great,—that is, calculated to exasperate both in its character and in respect to the person against whom it is directed. . . . Circumstances may affect the question by indicating whether or not the blow was such as would arouse uncontrollable passion in an ordinary person. The sufficiency of the provocation does not depend alone on whether it actually caused passion and heat of blood in the defendant, but also on whether it was calculated to cause such state of mind in a reasonable person; that is, there must be an adequate cause." 1 McClain, Crim. Law, §§ 337, 338, citing numerous authorities in support of the proposition.

In a note to the last section, it is said:

"It is not the fact that the blow is given in passion, but rather that there is provocation for such passion, that reduces it to manslaughter."

In one of the cases cited, it was expressly held that "the term 'reasonable' may properly be used in an instruction as descriptive of the kind of provocation which will reduce homicide from murder to manslaughter." *State v. Ellis,* 74 Mo. 207. In another standard work it is said:

"The provocation, in order to be sufficient in law, must be such as naturally and instantly to produce in the minds of persons ordinarily constituted the highest degree of exasperation, rage, anger, sudden resentment, or terror, rendering the mind incapable of cool reflection, and thus negativing the inference of malice. . . . The test of adequacy of the provocation is not merely whether ungovernable passion was in fact aroused by the provocation, but also whether the provocation was sufficient so to affect ordinary and reasonable men, or men of fair average mind and disposition, that they would be liable to act with violence endangering life." 21 Am. & Eng. Ency. of Law (2d ed.) 177, 178.

Among the numerous cases cited in support of the propositions is an English case, where it was held:

"When a person has killed another with a deadly weapon, even upon sudden passion, the question as to the sufficiency of provocation to reduce the crime to manslaughter is not merely whether there was passion in point of fact, but whether there was such provocation as might naturally kindle ungovernable passion in the mind of any ordinary and reasonable man." *Reg. v. Welsh,* 11 Cox, Cr. Cas. 336.

We must hold that there was no error in giving the instruction thus complained of.

7. After defining manslaughter in the fourth degree, and stating the circumstances under which the jury might convict of either degree in case they found from the evidence beyond a reasonable doubt that the killing was not justifiable nor excusable, the court stated to the jury, in substance, so much of the statute defining justifiable homicide as was applicable to the facts of the case. Subd. 2, sec. 4366, Stats. 1898. That was followed by giving the instructions upon that subject requested by the accused,—in effect covering the defense on that ground; and then saying to the jury:

"But the taking of human life is a matter of such serious import that it cannot be justified by only slight danger. The danger which will justify the killing of a human being must be actual, present, and urgent to the apprehension of the defendant. Anything less than this will not suffice to justify one human being in taking the life of another."

The objection to this portion of the charge is that it excludes danger which is "actual to the apprehension" of the accused, but which has no existence in fact; that it includes only danger which exists in fact and is also "present and urgent to the apprehension" of the accused. Such a construction would be too narrow for the practical administration, even, of the criminal law. What the court was manifestly trying to impress upon the jury was that, to the apprehension of the accused, the danger must be actual, present,

and urgent. The thing thus sought to be qualified was the danger which would justify the killing. True, in the first sentence of the instruction it is said that the taking of human life cannot be justified by slight danger only. Danger to whom? Manifestly, to the accused who attempts to justify; and the danger to him, as the jury were told, must be actual, present, and urgent to his apprehension. Besides, the court had just charged the jury, as requested by the accused, upon the same subject, to the effect that if the accused was assaulted by the deceased in such a way as to induce in him a reasonable belief of danger of losing his life or of suffering great bodily harm, then that he was justified in defending himself, "although the danger was not real,—only apparent;" and, again, that the accused was not to be held responsible criminally if he acted in self-defense, from real and honest conviction, induced by reasonable evidence, "although he may have been mistaken as to the extent of the actual danger;" that "a person need not be in actual imminent peril of his life, or of great bodily harm, before he may shoot his assailant;" that it "is sufficient if in good faith he has reasonable ground, from the facts *as they appear to him at the time,* to apprehend a design to commit a felony or to do some great bodily injury, and reasonable cause for believing that there is imminent danger of such design being accomplished." The charge on justifiable homicide is more guarded than in *Richards v. State,* 82 Wis. 172, 51 N. W. 652. The jury could not have been misled upon that question.

8. The statute defining excusable homicide reads as follows:

"*Such homicide is excusable when committed* by accident and misfortune in lawfully correcting a child or servant, or in doing any other lawful act by lawful means with usual and ordinary caution, and without any unlawful intent; *or by accident and misfortune in the heat of passion upon any sudden and sufficient provocation,* or upon a sudden combat, without any undue advantage being taken and without

any dangerous weapon being used, and not done in a cruel or unusual manner." Sec. 4367, Stats. 1898.

The court only gave to the jury the part in italics, and said, "That is the part of the statute which applies to the evidence in this case." In construing this section of the statute, this court has recently said:

"The statute was intended to cover at least three or more distinct and separate situations. . . . The several classes of cases are stated in a disjunctive form, and, under ordinary rules of construction, each constitutes a class by itself, and if the facts bring the case within any one of them the killing was excusable." *Campbell v. State,* 111 Wis. 161, 162, 86 N. W. 855.

The court gave to the jury three instructions requested by the accused, each of which was applicable to that portion of the statute read to the jury, all relating to the killing of O'Brien by accident and misfortune, in the heat of passion, upon sudden and sufficient provocation; but the court gave no instruction applicable to any portion of the statute not so read to the jury. Error is claimed because the court did not give the jury an opportunity to acquit the accused under the first clause of the section, a considerable portion of which was not read to the jury. That clause declares:

"Such homicide is excusable when committed by accident and misfortune in lawfully correcting a child or servant, or in doing any other lawful act by lawful means with usual and ordinary caution, and without any unlawful intent."

By convicting *Ryan* of manslaughter in the fourth degree, the jury necessarily found that the killing of O'Brien was "involuntary," and by "means neither cruel nor unusual" (sec. 4362, Stats. 1898); and hence that "such homicide" was "committed by accident and misfortune . . . and without any unlawful intent." This certainly includes some of the things which make homicide excusable. The question recurs whether the evidence was such as to have warranted the jury in finding that the homicide was committed by *Ryan*

"in doing" a "lawful act by lawful means with usual and ordinary caution." There was evidence from which the jury might have found that *Ryan* had reasonable ground to apprehend a design on the part of O'Brien to commit a felony upon him or to do him some great bodily harm. According to the testimony on the part of the accused, *Ryan* had, just before the shooting, stopped O'Brien from violently advancing upon him, by drawing his revolver; and so, when O'Brien was in the act of making another violent and threatening assault upon him, he repeated the experiment by drawing his revolver a second time, in hopes of deterring O'Brien from advancing further; not knowing that the revolver was cocked, and without taking aim, he leveled it up over his head toward O'Brien, who was about eight feet from him at the time, and told him to stop or he would shoot, but with no intention of shooting, when the revolver was discharged. We must hold that there was evidence from which the jury might have found that such homicide was committed by accident and misfortune in doing a "lawful act by lawful means with usual and ordinary caution, and without any unlawful intent." If so, under the statute quoted, it was excusable; and hence that question should have been submitted to the jury. Besides, the court refused to charge the jury to the effect that the accused "had a right to defend himself against the assault of the deceased by lawful means, with usual and ordinary caution, and without unlawful intent; and if, while so defending himself, he through accident and misfortune shot and killed deceased, the killing was excusable," and they should find the accused not guilty. Again, the court refused to charge the jury to the effect that the accused "had a right to draw and aim his revolver at or towards deceased, for the purpose of deterring and preventing the deceased continuing in his assault upon the defendant; this was a lawful means of defense, and if done with usual and ordinary caution, and without unlawful intent,

and the revolver was discharged, and the deceased killed, by accident and misfortune, then the killing was excusable," and they should acquit the accused. We must hold that it was error not to submit to the jury such question of excusable homicide.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded for a new trial. The warden of the state prison will surrender the plaintiff in error to the sheriff of Shawano county, who will hold him in custody until he shall be discharged, or his custody changed, by due course of law.