## STATE v. JOHNSON.

No. 7031.   Decided October 15, 1947.   (185 P. 2d 738.)

See 40 C. J. S., Homicide, sec. 122. Duty of court to instruct re-

garding exculpatory or mitigating statements in confession or admission introduced by prosecution, see note, 116 A. L. R. 1459. See, also, 26 Am. Jur. 524.

*J. R. Mulliner* of Salt Lake City, for appellant.

*Grover A. Giles,* Atty. Gen., *Brigham E. Roberts,* Dist. Atty., of Salt Lake City, and *Andrew John Brennan,* Deputy Atty. Gen., for respondent.

LATIMER, Justice

Defendant was convicted of the crime of involuntary manslaughter, and he appeals.

The death of the deceased, George Goddard, was caused by a blow struck by the defendant during an altercation in the Del Rio Cafe, located on West Second South Street, Salt Lake City, Utah. The entrance to this cafe is on the north and the floor plan of the cafe is such that there was a short counter in the front. To the south of the counter was a dining room that had three rows of booths running north and south. There was a five and a half foot aisleway separating the booths, constructed against the west wall from those in the center. The table occupied by the defendant and his party was situated in a large space at the south end of the cafe, this space extending the full width of the cafe.

The facts prior to the altercation are not in dispute, and are important only insofar as they give the setting of the drama which ended in the death of George Goddard.

The defendant with his wife and two other couples had met earlier in the evening, about 8:00 p. m. on the night of May 4, 1946. They visited several taverns, consumed

some alcoholic beverages, and arrived at the cafe some three hours later. They were given seats at a large table in the center and at the south end of the cafe, and their orders were taken by the waitress.

The deceased, together with Ralph Love and a third man who was never identified, arrived shortly thereafter. This party was seated in the last or most southerly booth on the west side. The deceased was facing to the north, with his back to defendant, and there was a cabinet immediately to the south of the booth. The distance between the tables used by the defendant and the deceased was roughly 30 feet.

Shortly after being served, defendant and his wife engaged in an argument which resulted in each of them slapping the other. Immediately after striking his wife, and in anger and embarrassment, the defendant started from the cafe. Apparently the commotion incident to this trouble caused several of the patrons of the cafe, including the deceased, to get up to see what had caused the disturbance.

Up to this point, the evidence is not in substantial dispute, and with the exception of the version given by two state's witnesses, there is little conflict in the remaining facts as testified to by all.

Other facts not in dispute were that the appellant was a large man, six feet tall, weighed 180 to 182 pounds, and his occupation was that of a stone mason. The deceased, on the other hand, was smaller in stature, being five feet six and one-half inches tall and weighing 158 pounds.

On the night of and shortly after the killing, defendant gave his version of the altercation to the police department of Salt Lake City. His answers to questions by the officers were these:

"Q. Then what happened? A. Well, as he got out of his booth and started toward me, I just hit him.

"Q. Describe exactly what happened by each of you. A. Well, there was a fight; don't recall what was said. I don't remember. I was so excited at the time after the trouble at the table. I just started to walk out. The fellow said something I don't remember what, but

he barred my way and I didn't say a word. He just stood in my way. After I slapped my wife, I started out, and about half way from our table to the booth where he was sitting he barred my way.

"Q. What do you mean, he barred your way? A. Well, he was coming at me when I started out. He saw what happened and said something to me, I don't remember what, and I just hit him.

"Q. Did he hit you back? A. No, there was just one hit. That is all that happened.

"Q. How do you know he was blocking your way? A. Well, he got up and started towards me, and I don't remember the exact words he used, but I could tell just from his appearance, could tell he was going to block me from going out. I could tell it."

At the trial, defendant and his witnesses gave the following version: As the defendant started down the aisleway, there were several persons, including the deceased, standing in the aisle. Defendant first noticed the deceased standing in the middle of the aisle. He, the defendant, intended to pass deceased on the right, and in order to do so, pushed him out of the way with his left hand. Deceased held on and then defendant hit him with his right hand, knocking deceased to the floor. That the deceased made no comment, said nothing to the defendant, made no threatening gesture, was not attempting to strike at defendant and gave no indication to defendant that he intended to offer him any physical violence. That Love got up from the table and was advancing towards defendant. That after deceased fell, Love was so close that defendant had to take about a step backwards before he hit Love, knocking him to the floor. An unknown third person took hold of defendant, but the latter shook himself free and left the cafe. That defendant did not believe he would have hit deceased, had he not observed Love advancing.

The principal difference between the version given by the State's witnesses and the evidence detailed above is that given by the waitress Miss King, and by Mr. Love. The former testified that deceased had just stepped into the aisle and was in the act of turning towards the approaching defendant when the blow was struck; that deceased slumped to the floor and the defendant pulled him and hit him a

second time; that deceased's hands were at his side when he was struck; and that he made no effort to interfere with defendant.

Witness Love, in his testimony, disputed defendant's evidence in regard to his position at the time of the blow. According to this witness, he was still seated at the table when the fatal blow was delivered. That he stood up and defendant turned around, struck him and knocked him down. When he got up, defendant was gone.

The defendant was charged under Section 103-28-5, U. C. A., 1943, which provides:

"Manslaughter is the unlawful killing of a human being without malice.

"It is of two kinds:

"(1) Voluntary, upon a sudden quarrel or in the heat of passion.

"(2) Involuntary, in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner or without due caution and circumspection."

Defendant made demand for a Bill of Particulars, which was furnished by the state, and the charge was set forth in the bill in the following language:

"That at the time and place alleged in the information, the defendant wilfully and unlawfully used force and violence upon the person of George Goddard by then and there striking the said George Goddard with his fist and the use of said force and violence proximately caused the death of George Goddard.

"That at the time and place alleged in the information, the defendant entered into a mutual combat with George Goddard and during said mutual combat the said defendant struck the said George Goddard with his fist thereby proximately causing the death of said George Goddard."

It is the contention of the defendant in this appeal that the Information and Bill of Particulars charge more than one unlawful act, and that the jury should have been instructed that before they could find the defendant guilty, all members must have agreed on one particular unlawful act. In this assignment of error, defendant

relies on the principles announced in the case of *State* v. *Rasmussen*, 92 Utah 357, 68 P. 2d 176. The decision in that case is not of assistance to defendant here, however, since in the case at bar the state charged only one unlawful act, namely, a battery. It is of no importance that in the Bill of Particulars the battery is alleged to have occurred when the defendant engaged in mutual combat with deceased. The latter allegation is surplusage, merely details the manner in which the battery occurred, and does not state a separate unlawful act.

Appellant requested an instruction on the law of self-defense, which the court modified to the extent of permitting the jury to determine whether or not the defendant used greater force or violence than reasonably appeared necessary to him to prevent injury from Love, ■ or detention by the deceased. The modification of the requested instruction is assigned as error. The trial court concluded the evidence was sufficient to permit the jury to determine the issue. Contrary to appellant's contention, there' was evidence of the use of excessive force. The instruction was adequate and the issue was properly submitted to the jury. See *State* v. *Law*, 106 Utah 196, 147 P. 2d 324.

The court refused to give one of defendant's requested instructions on excusable homicide, as that defense is defined in Section 103-28-8 U. S. C., 1943, and this refusal is assigned as error. This presents the most substantial question on this appeal.

Section 103-28-8, U. C. A., 1943, is as follows:

"Homicide is excusable in either of the following cases:

"(1) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution and without any unlawful intent.

"(2) When committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation or upon a sudden combat, when no undue advantage is taken nor any dangerous weapon used and when the killing is not done in a cruel or unusual manner."

Subsection 1 can be eliminated from consideration, for the reason that the facts of this case do not show the de-

fendant was doing a lawful act by lawful means. If he were in fact reasonably attempting to protect himself, then this issue was presented to the jury under ■ defendant's claim of self-defense. This issue was decided adversely to defendant. If he were the aggressor by shoving the deceased out of the way and then striking him, this would be a battery and therefore an unlawful act.

In order to apply the provisions of subsection 2, it is helpful to paraphrase the section. If this is done, the ■■ section is interpreted to read as follows:

"Homicide is excusable when:
"a. Committed by accident and misfortune in the heat of passion upon any sudden and sufficient provocation; or
"b. When committed by accident and misfortune in the heat of passion and upon a sudden combat."

That the first part as quoted does not apply is certain, in that the facts do not show any sudden and sufficient provocation. The most that can be said is that the appellant was angry with his wife, but that does not bring him within the coverage of the section. The provocation intended is that created by the party injured. In the case of *Ryan* v. *State*, 115 Wis. 488, 92 N. W. 271, 275, decided by the Supreme Court of Wisconsin, the court said:

"* * * A learned text writer, speaking upon the subject, says: 'In general, provocation consists in circumstances of such nature as are calculated to produce, and do produce, such excitement and passion as might obscure the reason of an ordinary man, and render him liable to do the act which causes the homicide. * * * The provocation should be sudden and sufficiently great,—that is, calculated to exasperate both in its character and in respect to the person against whom it is directed. * * *' "

It is not consistent with reason to excuse the killing of an innocent bystander because a killer has become incensed at a third person. A rule such as that would make life too cheap and uncertain. It is more reasonable to assume the legislature intended to make this defense available to a

person who by accident or misfortune killed, without intending to do so, the one who was reasonably responsible for exciting the passions of the killer. The record in this case is barren of facts showing any act or acts on the part of the deceased which would provoke a reasonable person to commit an act of violence, and we therefore hold the first subdivision of subsection 2 to be inapplicable, under the facts of this case.

To bring defendant within the protection of subparagraph b, it is necessary that there be evidence produced that the killing was done in the heat of passion  ■
and upon sudden combat. Webster's New International Dictionary, Second Edition, defines "combat" as:

"A fight, a contest, a struggle for supremacy, a duel  *  *  *."

This definition indicates to this court a participation of more than one person. It pictures a fight resulting from the acts of two or more persons. It savors of not only the intent to participate, but also the actual participation by both parties. It cannot be enlarged to include a one-sided attack on an innocent victim. The acts of one man can never constitute a "combat."

If we consider only the evidence favorable to the defendant, it does not establish that the deceased wanted to, intended to, or agreed to enter into any kind of combat with the appellant. There is no evidence that deceased attempted to strike him or do any physical  ■
harm whatsoever. There is an absolute lack of evidence indicating a desire or intention on the part of the deceased to become a participant, or of his actual participation, in a fight with this defendant. Not one word was said by deceased, not one threatening gesture made, and not a blow struck by him. Giving the defendant every benefit of the doubt, the most that can be said in regard to sudden combat is that deceased held onto defendant after the latter had pushed him aside. It would be going to unjustifiable lengths to hold that deceased must make no

effort to protect himself; otherwise, he becomes engaged in combat. No showing was made that deceased intended or desired to interfere in the defendant's marital difficulties. No words were spoken by deceased. His back was toward the table occupied by defendant, and until the time defendant attempted to pass, the fair inference from the testimony is that deceased was impelled by curiosity, as were others in the cafe, to ascertain the cause of the commotion. It is very questionable that deceased even knew that defendant was one of the participants.

The evidence produced by the defendant clearly establishes there was no combat as we understand the term. If we were to consider the testimony of the witness, Miss King, then there would be an additional reason why the issue of combat was not involved. According to this witness, the deceased was just turning around when he was hit the first time, and was lifted up from a slumped position to be hit a second time. The jury could have readily concluded from her testimony that the deceased never knew what hit him. The evidence given by this witness does not create a dispute in the facts about there being a combat; it merely emphasizes the defendant's evidence that deceased did not willingly participate.

The legislature, in dealing with the question of homicides, has permitted a killing to be excused when committed by accident and misfortune upon sudden combat and yet failed to give protection when the killing was accidental and accomplished in other combat. The legislature, therefore, must have taken into consideration the fact that there were elements favorable to the killer in the former that are absent in the latter. One of these elements would be time. This element can only be important when the combat arises so suddenly and with such speed that a reasonable person's mind would be rendered incapable of cool reflection and he would not, as a consequence, be permitted a sufficient time to deliberate on or determine the rashness or consequences of his act. However, the speed of development alone is not sufficient. There must be other

and additional circumstances. A person who is trained for combat might not be confused, bewildered, or enraged by suddenness. He could cooly and calmly survey the situation, and without emotion dispose of his adversary. Eliminating self-defense, there could be no justification or excuse for the act that resulted in a killing under these circumstances, even though the conflict developed suddenly. On the other hand, a rapidly developing situation might so confuse, enrage, or mentally disturb a reasonable person that he would fail to appreciate that serious consequences might result from his acts. The guiding principle under subsection (b) is not, did the combat arise with suddenness, but rather did the combat together with all the facts and circumstances that immediately preceded and those that surrounded it provoke, enrage, annoy, and confuse a reasonable man to such a degree that he might be excused from the results of his acts. If the acts were of such a nature, and the combat was sudden, then the defendant might be excused; otherwise, not. Were we to interpret the subsection to include only accident and misfortune upon sudden combat, then an aggressor could be excused because he struck in haste. We are convinced that the legislature did not intend such an absurd result.

Even though subsection (a) deals with the element of sudden and sufficient provocation, and subsection (b) is silent as to this element, this does not establish that some provocative action by the adversary is not necessary in sudden combat. If a defendant can be excused under subsection (a), he must rely on sufficient provocation. However, this element, to a lesser degree, enters into the defense under sudden combat (subsection b). Common experience teaches that sudden combat just does not happen without some act of provocation. Ordinary individuals just do not go around striking others without being challenged, exasperated, irritated, or provoked by some act of the person hit. If they were to do this, then no defense should be available to them.

Tested by the foregoing principles, the acts and conduct of the deceased in this case were not sufficient to legally

excuse this defendant for the killing. Again accepting the testimony favorable to the accused, his striking of the deceased was not brought about by any flagrant acts on the part of deceased nor by a suddenness that might have aroused the passions of a reasonable man to such an extent that an act of violence might have been likely to follow. If the time element was short, it was made so by defendant's aggressive tactics and not by any act of the deceased. If the deceased willingly participated, his participation consisted of holding on as the defendant shoved him out of the way. A reading of the record convinces us that neither the acts of the deceased nor the suddenness of the altercation confused or bewildered the defendant. On the contrary, the record convinces us that the defendant acted deliberately and methodically and with a willingness to and a knowledge that he was the aggressor in a quarrel of his own making.

It is admitted that the defendant is entitled to have the jury instructed on his theory of the case if there is any substantial evidence to justify giving such an instruction. However, when the legislature permits a defendant to avoid the consequences of his act because the killing was excusable, an instruction is not necessary unless the facts and circumstances impelling the accused to act are in some way consistent with the legislative intent to excuse. Under the evidence, the elements necessary to bring the accused within provisions of the excusable homicide are missing. The trial court did not err in refusing to give an instruction under the excusable homicide provisions of Section 103-28-8.

Other jurisdictions have interpreted statutes similar in wording to our Section 103-28-8. For the most part, the appellate courts have not separated the provisions into their separate and distinct parts. In these instances where the courts have discussed the severable provisions, the interpretations are not inconsistent with the one adopted here. The cases cited by the parties and those reviewed by this court all involve facts showing much greater aggravation

on the part of the deceased than is present in the record now before us. In all instances, some reasonable excuse for defendant's conduct was presented. Not an insignificant and unimportant provocative act, but one in substance that would have a tendency to inflame the passions of a reasonable man.

A brief resume of the facts of some of these cases will show the reasons the appellate courts held an instruction on excusable homicide should have been submitted to the jury. In the Wisconsin case of *Campbell* v. *State*, 111 Wis. 152, 86 N. W. 855, the defendant and another dance hall bouncer were engaged in quelling a disturbance. Without any warning the deceased struck the accused a powerful flow in the eye which staggered him and turned him around. Rapidly and instantly the accused grabbed a chair and struck the deceased over the head. The court held that the provocation was sufficient to entitle the defendant to an instruction on excusable homicide. In *Ryan* v. *State*, 115 Wis. 488, 92 N. W. 271, another Wisconsin case, the court held the instruction should have been given because defendant's evidence indicated he was doing a lawful act in a lawful manner. In that case on three separate occasions, deceased violently assaulted the defendant, who was trying to avoid trouble, and on the last occasion, while deceased was threatening another assault, defendant claims to have accidentally shot the deceased. Both provocation and justification were established. In *People* v. *Hampton*, 96 Cal. App. 157, 273 P. 854, the deceased started the argument by remonstrating with the defendant when the fatal blow was struck. The court in this case held the instruction given was erroneous because it merely permitted the jury to reduce the charge to manslaughter. In *Gaunce* v. *State*, 22 Okl. Cr. 361, 211 P. 517, the testimony of the defendant was that the deceased, after fighting another man on the sidewalk in front of the parked automobile in which defendant was sitting, and after defendant had remonstrated with the deceased by saying that he should not have struck the man, deceased came up to the car, used abusive language, reached into the car and

grabbed hold of defendant, and pulled him out of the car. A fight ensued in which deceased was killed. However, the great preponderance of the evidence was that defendant voluntarily entered into an affray in which he had no interest and assaulted the deceased in a wanton and reckless manner. The appellate court held that the trial court's refusal to give an instruction on excusable homicide in this case was not error. In *State* v. *Way*, 120 Or. 134, 249 P. 1045, 251 P. 761, the deceased quarreled over the ownership of sheep. Defendant accused deceased of trying to steal an animal, and deceased in reply called defendant a liar and assumed an attitude as if to fight. A fight ensued and deceased was knocked down. This brought the first fight to an end. After walking some distance the two men quarrelled again over the same matter, deceased dropped the reins of his horse and once more assumed a fighting pose. In this second encounter the deceased was struck and killed. In that case the Supreme Court of Oregon approved an instruction that if defendant and the deceased engaged in mutual combat in the heat of passion, and no undue advantage was taken and no dangerous weapon used, then the verdict must be rendered for the defendant.

In *State* v. *Coff*, 267 Mo. 14, 183 S. W. 287, the defendant's evidence indicated that because of unfriendly feelings between the families of defendant and deceased, that deceased's son stopped him on the street and accused him of using vulgar language in the presence of his wife. Defendant tried to explain to the son that he had insulted defendant's mother, whereupon the son struck the defendant in the mouth and a fight began. The father then came up, tried to hit defendant with a broom, and seized defendant by the throat to choke him. Defendant pushed the father, who thereupon fell into the gutter, injuring himself fatally. This case presented substantial evidence on both provocation and also the doing of a lawful act in a lawful manner. See also: *Thomason* v. *State*, 17 Okl. Cr. 666, 191 P. 1096; *Tucker* v. *State*, 41 Okl. Cr. 169, 262 P. 483.

It will be noted from the resume of the evidence as given that in most of the quoted cases, the evidence of the defendant established a state of facts which, if believed by the jury, established adequate provocation, lawful acts on the part of the defendant, or other aggravating facts not present in the case at bar. Had the defendant's evidence in this case presented an issue of fact under any one of the provisions of our excusable homicide statute, then he, too, would have been entitled to an instruction on one part or all parts of the section. However, we have reached the conclusion that there was no substantial evidence on the defense of excusable homicide, and therefore, an instruction to the jury on this phase of the law was unnecessary.

Appellant's next assignment of error arises out of the trial court's giving the following instruction:

"You are instructed in connection with the law of self-defense that the Defendant may not claim that rule of law as a defense in the case if the Defendant entered into mutual combat with the deceased. That is to say, if you find beyond a reasonable doubt that the Defendant struck the deceased and that in so doing he did not do so with the intent of protecting himself from bodily harm, but instead that he struck the deceased with the intent to enter voluntarily into physical combat with the deceased, then you are instructed that the Defendant may not claim self-defense."

It is not contended that abstractly the instruction is incorrect, but it is contended that it has no application in this case because there was no evidence of a mutual combat. Little need be said about this assignment. The evidence fails to establish mutual combat, not because ■ as claimed by appellant, he did not intend to engage in mutual combat, but because the evidence indicates the deceased did not intend to do so. The record reveals the only part played by deceased was that he held on as appellant attempted to brush him aside, and that the part of the aggressor was played by the defendant. Clearly, the facts of this case put in issue the defendant's intent to strike the deceased without justification. The jury was rightly permitted to pass on this issue even though the court used the

phrase "mutual combat." This phrase, at most, only added one element (i. e., the intent of deceased) and this element does not affect the reason or intent with which the appellant acted. If there was error in giving the instruction because there was no evidence to support it, then the error was not prejudicial to the appellant.

Other assignments of error have been considered, but they raise no substantial questions of law. Accordingly, they are overruled.

The judgment is affirmed.

McDONOUGH, C. J., and WADE and WOLFE, JJ., concur.

PRATT, Justice (in dissent).

As indicated in the prevailing opinion, the most important question centers upon the interpretation of Par. 2 of Section 103-28-8 U. C. A., 1943. That paragraph is paraphrased therein as follows:

"Homicide is excused when:
"a. Committed by accident and misfortune in the heat of passion *upon any sudden and sufficient provocation;* or
"b. When committed by accident and misfortune in the heat of passion (and) *upon a sudden combat.*"

I have italicized the two phrases that distinguish these paragraphs, and I would leave out the word "and" about which I have placed parentheses.

What is "sudden combat"? Sometimes it is easier to define by comparison, than otherwise. Let us consider first "mutual combat."

"Mutual combat" has implicit in its terms an exercise of judgment to engage in combat. Each participant acts, knowing that the other will voluntarily act likewise. It is governed by mutuality of intent—a meeting of the minds, as it were. It savors of agreement and understanding. Probably the outstanding historical example is the duel, for the settlement of difficulties. The acceptance of the in-

vitation: "Let's step outside the building and settle this matter," no doubt would result in mutual combat. The prosecution maintained that there was mutual combat (see bill of particulars). The lower court agreed there was. (See instruction discussed later.)

"Sudden combat" on the other hand lacks any thought of mutuality. It lacks evidence of any weighing of possibilities. It is merely the animal instinct to strike blindly under the stress of emotion. It is sudden, thoughtless, instinctive and when it occurs in the heat of passion our code says it shall be considered a human frailty which shall excuse serious results. Maybe our code should not have recognized it that way—maybe it is holding life too cheap to recognize such frailty as excusable, but that, if so, is a matter for the legislature not for this court. The defense maintained it was not mutual combat, but sudden combat.

"Combat" is not limited to a particular kind of physical contact, such as fist fighting, or wrestling. It might be a combination of many things — blows, shoving, holding, wrestling—any form of physical encounter. These following statements if believed by the jury might well support combat:

By the defendant:

"* * * and he took hold of me, and I tried to shake him off with my left hand, and he held on to me and then I hit him with my right hand."

By Mr. Love, a witness for the state:

"Well there was some scuffling."

By defendant to police:

"Well, there was a fight * * * I could tell just from his appearance, could tell he was going to block me from going out."

The probative value of these statements is for the jury, not the court.

So far as passion is concerned it is rather obvious that the circumstances of the whole affair of defendant's clash

with his wife were such that the jury might well conclude the defendant was leaving the place entirely upset and seething with emotion.

The mental state of an accused may be such that a mere spark may start a whole conflagration. The tinder that explodes with that spark is not necessarily explosive by reason of the fact that the spark has emanated from a particular source. The prevailing opinion, however, seeks to govern the explosive qualities of the tinder by that source and also by measuring the intensity of the spark.

In my opinion the reason for dividing the law (paraphrased) into paragraphs (a) and (b) lies in a recognition that there may be cases where the explosive qualities of the tinder are attributable to causes other than the source of the spark. If recognition should not have been given to such a distinction, on the ground that it would be holding life too cheap, that is a question for the legislature, not the court.

The prevailing opinion has this to say:

> "The guiding principle under subsection (b) is not, did the combat arise with suddenness, but rather did the combat together with all the facts and circumstances that immediately preceded and those that surrounded it *provoke*, enrage, annoy, and confuse a reasonable man to such a degree that he might be excused from the results of his acts." (Italics mine.)

This statement reads as though it might be one of what would be "sufficient provocation." Later in the prevailing opinion this is said:

> "Again accepting the testimony favorable to the accused, his striking of the deceased was not brought about by any *flagrant* acts on the part of the deceased nor by a suddeness that might have aroused the passions of a reasonable man to such an extent that an act of violence might have been likely to follow." (Italics mine.)

These two statements together certainly bring into the picture the element of "sudden and sufficient provocation," which is not an element of paragraph (b) but is, of paragraph (a). The use of the word "flagrant" is an admission that the deceased was the source of some

spark, but according to the prevailing opinion it just wasn't bad enough. I wonder if that isn't a question for a jury! Let the jury measure the intensity of the spark, if a certain degree of intensity is to be required.

I think the prevailing opinion is in error in trying to attach a *source* to the heat of passion. In doing so, they eliminated the necessity for having the two divisions in the law which are paraphrased as (a) and (b) above. The question of sudden combat should have been submitted to the jury. The lower court instructed upon "mutual combat," and that I think was also prejudicial error. There is no evidence of mutality of combat; no evidence of a meeting of the minds as to what was to occur; no evidence of the exercise of judgment by the participants as to whether or not they would engage in conflict. It all happened on the spur of the moment, and was guided by a rush of emotions, not reason.

Mutual combat, when supported by evidence, is one method whereby the prosecution may defeat the plea of self defense by an accused. The accused may not complain, if the evidence will support such a version of the affair; but if it will not support that version, to instruct upon it, may confuse the jury into the belief that the conflict must have some aspects of mutuality, or the court would not have so instructed. It jeopardizes defendant's rights as to a plea of self defense. It confuses the issues in this case because all parties were contending for some kind of combat. It invites an acceptance of the prosecution's viewpoint without evidentiary support.

I shall not discuss authorities, but merely cite them for reading by any who may be interested. *Campbell* v. *State,* 111 Wis. 152, 86 N. W. 855; *State* v. *Bell, Del. O. & T.,* 192 A. 553; *Driggers* v. *United States,* 21 Okl. 60, 95 P. 612, 129 Am. St. Rep. 823, 17 Ann. Cas. 66; *Dodson* v. *Commonwealth,* 159 Va. 976, 167 S. E. 260; Words and Phrases, Vol. 27, p. 934.