STATE v. HENRY TOWERS.[1]

November 20, 1908.

Nos. 15,537—(34).

**Homicide—Question of Manslaughter Withheld.**

> After the defendant was assaulted in a saloon, he went to his home, three and one half blocks away, procured a shotgun, and returned and shot the person who had assaulted him. *Held,* that the trial court properly refused to submit to the jury the question whether the defendant was guilty of manslaughter.

**Charge to Jury.**

> The court should not instruct the jury with reference to the law of manslaughter, unless there is evidence tending to establish the elements which constitute that crime.

**Murder.**

> When the undisputed evidence shows that the homicide was committed with a dangerous weapon with a design to effect death, or under cir-

[1] Reported in 118 N. W. 361.

cumstances from which such a design must conclusively be inferred, and after a lapse of time sufficient for passion to subside, the crime is murder, and not manslaughter.

**Error Cured by Charge to Disregard.**

The reception of incompetent evidence, which is afterwards stricken out, is not ordinarily reversible error, especially when the court instructs the jury that they are not to consider such evidence.

Defendant was indicted in the district court for Crow Wing county for the felonious killing of one Albert Hagadorn and was convicted of murder in the third degree and sentenced to state prison for twenty.five years. The facts are stated near the end of the opinion. From an order, McClenahan, J., denying defendant's motion for a new trial, he appealed. Affirmed.

On the question of insanity the court charged the jury that, when the defendant undertakes to establish the defense of insanity, the burden is on him to establish affirmatively by a fair, reasonable preponderance of the evidence the nonexistence of the normal, sane condition which the law presumes every man to possess. If the jury should determine murder in one of the degrees had been committed, then it was their duty "to take up the question whether or not there was such mental incapacity upon the part of the defendant at the time he committed that particular degree of crime as to excuse him, as to deprive his act of its criminal character, and if you so find you must acquit him.

"Sanity and insanity are terms applicable· to the mode of operation of the mind as judged by some accepted standard of normality. The accepted standard of normality is fixed in this state by statute. No person shall be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, because of idiocy, imbecility, lunacy, or insanity, as not to know the nature of his act, or that it was wrong. That indicates ·the accepted standard of normality in this state. Any man who commits a crime and knows the nature of his act and that it was wrong cannot escape the consequences of his act upon the defense of insanity.

"The mode of operation of the mind is ascertainable from the conduct of the person in question, that is to say, from the effect produc-

ed by his surroundings on his mind when responding by action to those surroundings. No single act can be of itself decisive; but any act may be significant to some extent, some inference is always possible. So a specific act may indicate sanity or insanity, may throw light, one way or the other, on the issue. If certain conduct be offered as indicating insanity, it may be explained away as equally, or more, consistent with some other hypothesis. That which appears to be an irrational act or utterance may, in the light of certain facts, be rational, or may be the result of some other abnormal mental condition than insanity. Such explanatory facts are always admissible, and when admitted must be considered by the jury in connection with all the other pertinent facts in evidence. A condition of mental disease is always a more or less continuous one, either in latent tendency or in manifest operation. It is therefore proper, in order to ascertain its existence at a certain time, to consider its existence, if such be the fact, at a prior or a subsequent time. The degree of continuity varies and there can be little certainty in the inference from one period to another. As to its prior existence, the type of insanity, if any, as preliminarily indicated by the person's conduct, must be considered, in determining its bearing upon the conduct of the defendant at the time of the commission of the alleged criminal act. Assuming the existence of different types at different times, and their effect upon the conduct of the person at such times, the first type may be, in a given case, so essentially variant from the latter type as to be wholly irrelevant and without substantial significance. And as to subsequent insane conduct, if any, care must be exercised in its consideration in view of the fact that the defendant, in a criminal case, may be feigning insanity after the act charged.

"Now, remember, gentlemen, I am only giving you general rules. I am not taking any position upon the facts in this case. I have no opinion to express upon the actual issue in the case. I have, in the course of this charge, assumed certain facts to be established beyond question, and I am justified in doing that because there is no contradiction of such facts; but where the evidence of witnesses does not agree, the question is one for the jury solely and absolutely, and this question of sanity or insanity is of that character. Evidence has been introduced before you bearing upon both phases of this case. The

defendant took up the question and introduced testimony which tended to show his mental aberration extending over some period of time before the commission of this crime, if it was a crime. The degree of aberration of this character, if there was any aberration, is a matter for you to determine, and its possible effect upon the act that he stands charged with here is a matter for you to pass upon and determine. If you find because of all the evidence in the case, including that which relates to his past history, and by his past history I mean his history before the commission of this act, his conduct at the time the act was committed, and his conduct following the commission of the act, that he didn't know the nature of the act, or if he did know it that he didn't know it was wrong, then the defense of insanity is established and he is entitled to an acquittal; otherwise, it isn't established, and you must return a verdict in one of the degrees of murder that I have submitted to you."

*Albert H. Hall* and *W. A. Fleming,* for appellant.

*Edward T. Young,* Attorney General, and *J. H. Warner,* County Attorney, for the State.

ELLIOTT, J.

The defendant, Henry Towers, was convicted of the crime of murder in the third degree and sentenced to imprisonment in the state prison for a term of twenty five years. On appeal to this court he contends that a new trial should have been granted because (1) of the misconduct of the county attorney; (2) error in the admission, over objection, of evidence tending to show an encounter between the appellant and another man three years prior to the homicide; (3) in refusing to define the offense of manslaughter in the first degree, or submit to the jury whether the defendant was guilty of manslaughter in the first degree, as requested; (4) and in refusing to give certain instructions in reference to the defense of insanity.

1. In his opening address to the jury the county attorney stated that the state would show that the defendant had at other times had difficulties of a similar character with other people. During the trial evidence was introduced which tended to show that three years ·prior to the shooting of Hagadorn, Towers had engaged in a fight in a saloon, and had attempted or threatened to use a gun. This evidence

was clearly inadmissible, and was properly thereafter stricken out. The court did not refer to this testimony specifically in the charge to the jury, but did instruct the jury that "anything that has been testified to, and afterwards stricken out by the court, you are not to consider in making up your final conclusions in reaching a verdict in this case." Under the circumstances, the error in receiving the testimony was cured, and was without prejudice. The statement of the county attorney was of little if any importance.

2. The instructions with reference to the defense of insanity were in accord with the rule which is thoroughly established in this court, and the court properly refused to give instructions which were framed upon other theories.

3. The other assignments of error are based on the refusal of the court to submit the issue of manslaughter in the first degree to the jury. If there was no evidence to justify a conviction for manslaughter, the court properly refused to permit the jury to consider the matter. State v. Smith, 56 Minn. 78, 57 N. W. 325. We find no such evidence in the record. If any error was committed, it was favorable to the defendant in instructing the jury that he might be convicted of murder in the third degree. The real defense that was interposed was that of insanity, and, if the defendant was sane, he was properly convicted of murder.

Homicide is manslaughter in the first degree when committed without a design to effect death, "in the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon." R. L. 1905, § 4881; chapter 125, p. 162, Laws 1905. The evidence did not bring the case within the terms of this offense. The homicide not only must have been committed in the heat of passion, but it must have also been without a design to effect death. When a sane man deliberately fires a shotgun into the body of a man, the jury cannot be permitted to speculate as to his intentions. The law draws the inevitable conclusion that he intended to effect death. This alone disposes of the claim that this appellant might be found guilty of manslaughter.

In indulgent recognition of the frailties of human nature, the statute allows a person charged with homicide to show that the act was committed without a design to effect death, while under the influence

of sudden passion resulting from legally sufficient provocation, in order to reduce the offense from murder to the less malignant offense of manslaughter. The provocation in this case was sufficient to influence a reasonable person and induce the passion, which, had it resulted in an immediate killing, would have reduced the degree of the crime. But, if a sufficient time had elapsed between the provocation and the killing for the passion to cool, the act must be deemed malicious, and therefore murder. People v. Kerrigan, 147 N. Y. 210, 41 N. E. 494. "The question is not whether the blow was actually struck in a continuance of the passion, but whether there had been a reasonable time for the passion to cool in the case of an ordinary person, or whether the defendant did actually commit the homicide in cold blood." 1 McClain, Cr. Law, § 343. We need not at present determine whether the question of sufficient cooling time should be governed by the standard of a reasonable person or that of the particular defendant. See State v. Hazlet, 16 N. D. 426, 113 N. W. 376; Small v. Com., 91 Pa. St. 304, 308; Ryan v. State, 115 Wis. 488, 92 N. W. 271 (provocation); Wharton, Homicide (3d Ed.) § 205. The authorities are conflicting, but under either rule this case would have to be affirmed.

Ordinarily the question of the sufficiency of the provocation and the cooling time are for the jury to determine, but under some circumstances both may become questions of law for the court to determine. State v. Smith, 56 Minn. 78, 57 N. W. 325; State v. Shippey, 10 Minn. 178 (223), 88 Am. Dec. 70; State v. Hoyt, 13 Minn. 125 (132).

The provocation must be such as the law considers sufficient (see Baumgartner v. Hodgdon, 105 Minn. 22, 116 N. W. 1030), and the time for cooling may be so great that but one conclusion may be allowed to be drawn. We take this to be such a case, and, as there was no evidence which would justify a verdict of manslaughter, the trial court properly refused to give the requested instructions.

The appellant, Henry Towers, at the time of the homicide was fifty one years of age. For some time prior to December 25, 1906, he had been engaged as a foreman in the Northern Pacific Railway shops at Brainerd. About twelve years before he had tripped on some oilcloth, and fallen in such a manner as to strike and cut the back of his

head. About two weeks prior to December 25, 1906, he had fallen, or been thrown against a stove, and received a severe injury from a blow upon his head. There was evidence tending to show that as a result of these injuries he was in a physical and mental condition which rendered him very susceptible to excitement, and easily thrown from his normal mental balance.

On Christmas morning, 1906, the appellant was in a saloon, drinking with some of his acquaintances. Shortly before noon Albert Hagadorn, his brother Fred and three other men entered the saloon. The men had been going the rounds of the saloons, and all were somewhat under the influence of liquor. Albert Hagadorn made an unprovoked assault on Towers, who was knocked down and badly maltreated. When he regained his feet, he left the saloon, went to his home, got his shotgun, and returned and shot Albert Hagadorn, inflicting a wound from which he soon after died. After Towers left the Hughes saloon, the scene of the assault, Hagadorn and his party remained there for a few minutes, and then left and went toward another saloon. As they came in front of this place, Towers came around the corner of the building. Albert Hagadorn started into the saloon, and had passed within a storm door, when Towers fired a load of bird shot through the storm door and into Hagadorn.

The assault in the Hughes saloon occurred at about twelve o'clock. Towers lived three and one half blocks from the Hughes saloon, so that he walked practically seven blocks. The evidence shows that from fifteen to twenty minutes elapsed between the time of the assault and the shooting. On his way to and from his house Towers met and spoke to several people. He informed the witness Horn that he was going home and get a gun and kill "one or two of them. I couldn't swear which." Immediately after the firing of the shot, the witness Claus heard Towers tell a bystander to mind his own business, "or I will take a wing off of you."

The act was manifestly deliberate, and if, as the jury found, Towers was in possession of his senses, and not insane, the necessary conclusion is that he was guilty of murder, and the court properly refused to submit the issue of manslaughter to the jury. The order denying a new trial is affirmed.