# STATE v. HARVEY R. NORTON.[1]

May 3, 1935.

No. 30,288.

*Harold C. Bellew,* for appellant.

*Harry H. Peterson,* Attorney General, *Roy C. Frank,* Assistant Attorney General, *Ed J. Goff,* County Attorney, and *Howard T. Van Lear,* Assistant County Attorney, for the State.

I. M. OLSEN, JUSTICE.

The defendant was indicted for murder in the first degree, was tried under the indictment, and convicted of murder in the second degree. He appeals from the judgment of conviction. The only error assigned and claimed is that the court erred in failing to instruct the jury that they might find the defendant guilty of manslaughter in the first degree. A request so to charge was made and denied.

On the 20th day of February, 1934, in an apartment in the city of Minneapolis, the defendant shot his wife, Rena Norton, with a revolver and wounded her so that she died thereafter on February 22, 1934. The husband and wife had been separated for some time and the wife was living in an apartment in the city. On February 20, at about four o'clock in the afternoon, the defendant went to the apartment to see his wife and to attempt to induce her to come back and live with him. He was admitted to the apartment and had some controversy with his wife, resulting, as testified to by the

[1]Reported in 260 N. W. 502.

wife's younger sister there present, in a fight between them. The wife told her sister to call the police. Defendant attempted to prevent the sister from leaving the apartment to call the officers. She finally got out, and the police were called. The wife left the apartment about the same time. Apparently the apartment door was locked, either by the wife from the outside or by the defendant, who remained in the apartment. In about 15 minutes two policemen appeared. They were informed as to defendant's being in the apartment and told that he had a gun. The wife accompanied the two policemen to the door of the apartment. She had a key, but neither she nor the policemen were able to open the door. The wife then spoke to her husband through the door, and he asked her if she was alone. She said that she was. Defendant then opened the apartment door slightly and stood at the opening with a revolver in his hand, pointing it at the opening of the door. One of the policemen shoved the door open, and the two policemen entered. Defendant was alone in the apartment. He pointed the revolver at the policemen and stood back. There was then some effort by the two officers to have him put away the gun or deliver it up. He refused to do so and retreated across the room, covering the policemen with the gun and telling them to keep back. By talking to him they continued their efforts to get him to put away the gun or to deliver it to them. The wife had not yet reëntered the apartment, but, while this was going on, she came in, passed the policemen, and stood in front of her husband. He then asked her, using some pet or endearing name, if she would come back to live with him or give him a written statement to that effect, and she refused. She then, while standing three or four feet in front of him, called him a vile name and told him to get out and stay out. She was standing, at the time, almost directly in front of the policemen, on whom the defendant kept his gun trained during this time. When his wife made this statement to him the defendant slightly shifted the aim of the gun and shot her.

The court read to the jury the statutory definitions of murder in the first, second, and third degree and explained to them the application of these definitions. We need not go into detail in de-

fining these degrees of murder. It is sufficient to say that murder in the first degree requires a premeditated design to effect the death of the person killed or another. Murder in the second degree requires a design to effect the death of the person killed or another, but without deliberation or premeditation. Murder in the third degree is the killing of a human being, when perpetrated by act eminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any individual, or without a design to effect death, by a person engaged in committing or attempting to commit a felony either upon or affecting the person killed or otherwise. Manslaughter in the first degree is the killing of a human being without a design to effect death, by a person committing or attempting to commit a misdemeanor; or in the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon.

There was some claim by the defendant in his testimony that he was intoxicated and that he did not know what he was doing and did not intend to shoot his wife. Defendant's testimony was contradictory, and, as shown by his cross-examination, he claimed not to remember anything which he had testified to even in his direct examination. His testimony was such that the jury apparently did not accept his claims as to intoxication or no intent to kill. There was ample evidence by numerous witnesses that, while there was an odor of liquor perceptible on his breath, he was not intoxicated at the time, and there was no serious contention made in defendant's brief that he was so intoxicated as to make that any defense under the statute. 2 Mason Minn. St. 1927, § 9914. This defendant had been in the army. He had served as a police officer in Minneapolis. He had carried a revolver on special police duty, and the presumption is conclusive that he was well acquainted with the use of firearms and with the deadly nature of such a gun as he carried at the time. He came to the apartment carrying the gun in his pocket. He held up the police officers with the gun pointed at them and then turned the gun on his wife and shot her so that she died. We think it may be well said here, as held in the case of State v. Towers, 106 Minn. 105, 109, 118 N. W. 361, that when a man deliberately

fires a gun into the body of another the jury cannot be permitted to speculate as to his intention. The law draws the inevitable conclusion that he intended to effect death. There is no dispute about the law that, if there was evidence reasonably tending to reduce the offense from murder to manslaughter, the court should have submitted the question of manslaughter. We think there was, no evidence reasonably tending to show that the offense was manslaughter instead of murder. In order to convict of murder in the second degree, the jury, of course, must have found that the shot was fired with an intent to cause death. If the jury had found otherwise, they could not have convicted of any greater crime than murder in the third degree, which was submitted to them. The fact that they found defendant guilty of murder in the second degree instead of the third degree seems conclusive that the jury would not have returned a verdict of manslaughter, as they did find an intent to cause death, and could not, under those circumstances, convict of manslaughter.

The state cites, as bearing upon the question here, in addition to State v. Towers, 106 Minn. 105, 109, 118 N. W. 361, the cases of State v. Smith, 56 Minn. 78, 57 N. W. 325, and State v. Pontoniec, 117 Minn. 80, 134 N. W. 305. In State v. Smith, 56 Minn. 78, 88, 57 N. W. 325, this court emphasized the fact that in a case where a claim is made that the crime of manslaughter should be submitted the instrument or weapon with which the homicide is effected must be taken into consideration. We think that applies with special force to this case.

The court properly refused to submit the question of manslaughter in the first degree, and we find no error in that regard.

The judgment of conviction is affirmed.