STATE, Respondent, *v.* DeHaan, Appellant.

(No. 6,695.)

(Submitted November 7, 1930. Decided November 19, 1930.)

[292 Pac. 1109.]

*Mr. George A. Horkan* and *Mr. I. W. Choate,* for appellant, submitted a brief; *Mr. Horkan* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. L. V. Ketter,* Assistant Attorney General, for the State, submitted a brief; *Mr. Ketter* argued the cause orally.

MR. JUSTICE FORD delivered the opinion of the court.

The defendant was convicted of the crime of assault in the second degree, committed upon the person of Mrs. R. T. Sinnema, and was sentenced to a term in the state's prison. He has appealed from the judgment and an order denying him a new trial. The sole question presented is whether there is sufficient evidence to sustain the judgment.

On appeal in criminal cases the review of the evidence by this court is limited to an examination of the record to determine whether there is any substantial evidence to justify the verdict. (*State* v. *Gustin,* 85 Mont. 581, 281 Pac. 351; *State* v. *Slothower,* 56 Mont. 230, 182 Pac. 270.)

The evidence shows that on October 5, 1929, at about 8 o'clock in the morning, defendant visited the home of the complaining witness and engaged her in a casual conversation about the weather, chickens, turkeys, etc. Just before leaving he said to her, "You were not at home last night, were you?" To which she replied, "No, I wasn't. I took my sister home. Then I met my husband coming from the machine." Defendant then said, "So your sister isn't here no more?" Prosecutrix replied, "No, she isn't." She next saw defendant about 4 o'clock in the afternoon. He came to her home on horseback and asked for a drink of water; she invited him to have a cup of tea, which he accepted and, after talking with her fifteen or twenty minutes, left, saying, "I must be going; I have to go to Amsterdam to-night." Two to five minutes later defendant returned to the house, pointed a gun at prosecutrix as she was sitting at the sewing-machine, and said, "I guess I'll kill you first." She became frightened, started to pick up her baby, when defendant struck her on the head

with the gun, causing a wound which bled profusely. Defendant then said, "Now you keep your blab shut" or "don't tell nobody," and then went outside to his horse. As prosecutrix locked the screen, defendant said, "Did I hurt you, Edith?" She assured him that she was all right, to which he replied, "Look, it is all blood on your dress." He then said, "I'm going away now. I'm going to kill myself. This will be the last time you will see me." He then rode away. The following day defendant was found hiding in a hole dug in a haystack. He had the gun at the time, but offered no resistance.

Mrs. Sinnema testified that she had known defendant and his wife for four or five years; that they were friends, and that in her conversation with him on October 5 he acted as a normal man in every respect; that there was nothing unusual in his appearance and that he did not do or say anything that was improper; "we had no trouble then of any kind."

The defense was insanity, and in support thereof a number of defendant's neighbors and friends testified that for many years defendant had suffered from severe headaches and on such occasions his face was swollen and red; his eyes "would blear and get bloodshot." Defendant's wife testified that her husband left home on horseback the morning of October 5, complaining of a serious headache; that he ate no breakfast except a cup of coffee. Before he left he took some medicine which he had been using for over half a year, and "he was kind of sulky like he always was when he had a headache." She also testified that at times she had noticed blood on her husband's pillow. There was other testimony that on the day in question defendant was sulky and his face was red and swollen.

Dr. R. P. Smith, chief of the nervous and mental section of the United States Veterans' Bureau for the treatment of ex-service men at Ft. Harrison, after qualifying as a specialist of long experience in the treatment of nervous and mental diseases, testified that he made a physical and mental examination of defendant two days before the trial; that at the conclusion of the examination he determined that defendant

was suffering from mental epilepsy, and that his case was the typical history of what is called nocturnal epilepsy, that is, epilepsus in the night, in sleep, when a man does not know it. He had heard the testimony of all the witnesses in the case, and that based on their testimony as well as upon his own examination, he was confident that defendant "had a case of what we call epileptic automatism. * * * I have no question in my mind that the man on the fifth day of October, 1929, when this offense was committed as testified to, on that particular occasion was incapable of either selecting the right and rejecting the wrong, or knowing the nature and character of the act he was performing, on account of his mental state at that time, which was one of epilepsy"; that a man having this disease might suddenly through fear or horror strike and become vicious without actually knowing that he did it; that there are numerous cases on record where men automatically do acts and are not aware of the fact until it is over. "They have gone through a particular act and have no recollection whatever of what happened during that period of time. They not only are incapable of distinguishing between right and wrong, but are not a free agent—they are not acting with consciousness of what they are doing. They are under the control of a brain disease in which they are absolutely deprived of consciousness. The man has no knowledge of what he is doing or how he is doing it." He testified that he had discussed the occurrence with defendant in detail, and "he told me everything about it."

In rebuttal, Dr. A. D. Brewer testified that, upon practically the same facts taken into consideration by Dr. Smith, he could not say that defendant did not know the difference between right and wrong when the assault was committed.

Dr. C. F. Jump also testified in rebuttal that he was not able to say that defendant was insane at the time of the assault and did not comprehend what he was doing. On cross-examination he stated that he had not taken into consideration the lack of motive, but, if there was none, he could not say whether

defendant was capable of distinguishing between right and wrong.

From this brief summary of the evidence we think it clear ▊ that there is substantial evidence to support the verdict. While it is true that Dr. Smith testified that in his opinion defendant at the time of the assault was suffering from mental epilepsy, and other witnesses that defendant had suffered severe headaches, on the other hand, the testimony tends to show that on the day the offense was committed defendant talked and acted normally; he was possessed of sufficient mentality to remember that prosecutrix was not at home on the evening before; he apparently appreciated what he had done by asking prosecutrix if he had hurt her and warning her to "keep your blab shut"; he did not go home after the crime, but concealed himself in a hole in a haystack, where he was found the next day by the officers, which might tend to show that he knew and appreciated what he had done. A month later, as Dr. Smith testified, defendant was able to discuss in detail "this entire transaction—and he has told me everything about it."

The court instructed the jury that the state must prove ▊ beyond a reasonable doubt that defendant was sane at the time of the commission of the offense, thus putting the burden upon the state. This instruction was not justified. (*State* v. *Vettere,* 76 Mont. 574, 248 Pac. 179.) Chapter 87, Laws of 1925, provides that, when the commission of the act charged as a crime is proven, and the defense sought to be established is the insanity of the defendant, the same must be proven by the defendant by a preponderance of the testimony. But notwithstanding this instruction, the jury found defendant guilty, thereby finding that he was sane at the time the assault was committed, and we cannot say the verdict was not justified.

The judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY, and ASSOCIATE JUSTICES MATTHEWS, GALEN and ANGSTMAN concur.