STATE v. JOHN E. FINN.

100 N. W. (2d) 508.

January 8, 1960—No. 37,036.

*George G. McPartlin,* for appellant.

*Miles Lord,* Attorney General, *William B. Randall,* County Attorney, and *Frederick O. Arneson,* Assistant County Attorney, for respondent.

DELL, CHIEF JUSTICE.

Defendant appeals from a judgment of conviction of murder in the first degree. It is undisputed that on December 28, 1955, the defendant shot and killed his wife, Ann Finn, at her apartment in St. Paul. The defendant's only defense is that at the time of the offense he was of unsound mind. Only a brief summary of the facts is necessary to a disposition of the issue raised.

The defendant and the deceased were married in June 1954. The marriage was not a happy one and in November 1954 the deceased instituted a separate maintenance action resulting in a decree in March 1955 awarding her $60 per month for support. Following the marriage, and particularly after the separation, the defendant became moody and depressed. He complained that his wife was "running around with some fellow," and repeatedly expressed bitterness at having to pay her support money. While he had previously been well groomed, his appearance became untidy and unkempt. The defendant, who was employed as a railroad car checker, worked steadily, however, up to the day of the shooting, and there was no variation in the quality of his work.

Approximately 6 weeks prior to the shooting the defendant purchased a gun at Shakopee and on December 6, 1955, obtained shells for it in St. Paul. On December 28 he had two or three drinks at his apartment in St. Paul, took the gun and went to the deceased's apartment to wait for her. When she arrived he followed her into the apartment and shot her four times. He came out into the hallway saying "I did it. Call the police. I'm sick. I've been sick a long time." Although appearing to be exhausted and distraught, he answered the questions of the first police officer to arrive at the scene in a direct and coherent manner.

In May 1955 the defendant consulted a social welfare agency and asked for a psychiatric referral. An appointment was arranged with the Hamm Memorial Psychiatric Clinic and on May 26, 1955, the defendant was interviewed by a social worker at the clinic. It was felt that the defendant was in need of psychiatric attention and arrangements were made for him to see Dr. Clarence Rowe, a psychiatrist connected with the clinic. Dr. Rowe testified that when he saw him the defendant "appeared highly depressed, but not specially so, nor did he seem suicidal." Another appointment was made for him in June but the defendant called and cancelled it.

Dr. Hobert Sitzer, a general practitioner, saw the defendant on November 25, 1955. At that time the defendant was very depressed and the doctor advised him to obtain psychiatric care. On December 12,

1955, the defendant, having called earlier for an appointment, again saw Dr. Rowe at the Hamm Clinic. At that time the defendant appeared very suspicious and Dr. Rowe concluded that he was probably a paranoid. Arrangements were made for him to have psychological tests which were given on December 20, 1955. These tests were not scored until December 29, the day after the killing. Dr. Rowe testified that from all of the information available to him the defendant was probably a paranoid at the time he shot his wife and that the shooting was the product of this mental illness. The testimony of Dr. Murray Stopol, the psychologist who administered the tests to the defendant, substantiated this conclusion.

Doctors Kamman and Artz, psychiatrists called on behalf of the prosecution, testified, in essence, that while the defendant might have been mentally ill on the day of the fatal shooting, he was not sufficiently ill so that he did not know the difference between right and wrong and the nature of his act.

■ As we understand the defendant's argument, his primary contention is that the trial court improperly instructed the jury as to the defense of insanity. The jury was charged in accordance with the language of M. S. A. 610.10, which provides:

"* * * [A] person * * * shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes [idiocy, imbecility, lunacy, or insanity], as not to know the nature of his act, or that it was wrong."

This statute, originally enacted in 1885,[1] had its origin in the rules promulgated in M'Naghten's Case, 10 Clark & Finnelly 200, 8 Eng. Rep. 718, commonly referred to as the "right-and-wrong" test of criminal insanity. Under this test every man is accountable for offenses committed by him unless, by reason of a diseased mind, (1) he did not know the nature of the act or (2) that it was wrong. For many years the right-and-wrong test has been subjected to severe attack on the ground that it is archaic and inadequate. Those who oppose the

---

[1] Penal Code 1886, §§ 18, 19.

rule argue, among other things, that under modern psychiatric concepts man's reason is not the sole determinant of his conduct and that emotional drives and pressures must be recognized in attempting to formulate a guide of an accused's responsibility.[2] In short, it is urged that the M'Naghten test is unrealistic and deals in concepts of no real psychological significance.

Several jurisdictions have modified the M'Naghten rule by using, in conjunction therewith, the so-called "irresistible impulse" test.[3] Under this test the defendant is relieved of responsibility if he acted upon an impulse made irresistible by mental disease regardless of whether he knew the act was wrong. However, in the leading case of Durham v. United States, 94 App. D. C. 228, 214 F. (2d) 862, 45 A. L. R. (2d) 1430, even the modified M'Naghten test was found inadequate. The court reasoned that the irresistible-impulse test failed to recognize mental illness characterized by brooding and reflection. It adopted the broad test that a defendant should be found not guilty by reason of insanity if his unlawful act was the product of mental disease or mental defect.[4] The defendant argues that the trial court erroneously denied his requested instructions couched in the language of the Durham and irresistible-impulse tests.

Both the irresistible-impulse test and the Durham test have been challenged for a variety of reasons as being unworkable and of questionable merit.[5] Still other guides have been suggested as being substantial improvements over any test heretofore devised.[6] But whatever the merit of these various concepts may be, if any change is to be made in this jurisdiction in the accepted standard of criminal re-

---

[2]The authorities are exhaustively compiled in Durham v. United States, 94 App. D. C. 228, 214 F. (2d) 862, 45 A. L. R. (2d) 1430.

[3]See, e. g., United States v. Smith, 5 USCMA 314, 17 CMR 314; Sharp v. Commonwealth, 308 Ky. 765, 215 S. W. (2d) 983; Commonwealth v. McCann, 325 Mass. 510, 91 N. E. (2d) 214; 1 Wharton, Criminal Law and Procedure, § 42.

[4]See, 39 Minn. L. Rev. 573.

[5]See State v. Davies, 146 Conn. 137, 148 A. (2d) 251, for a review of the critics of the Durham test; see, also, Annotation, 45 A. L. R. (2d) 1447.

[6]See, e. g., Note, 41 Minn. L. Rev. 334, 347.

sponsibility, it must be done by the legislature. Section 610.10 defines clearly and unequivocally, in the language of the M'Naghten case, the only grounds upon which the defense of insanity is allowed.[7] The test has been consistently applied in this state, at least in criminal matters, without modification.[8] In State v. Scott, 41 Minn. 365, 371, 43 N. W. 62, 64, this court held that since the language of the statute did not embrace the irresistible-impulse test, the court could not, on its own volition, promulgate such a test. The court said:

"It is thus apparent that when, in 1885, our Penal Code was adopted, section 19 being copied from the 21st section of the Code of New York, the meaning and effect of the language employed, and which for 40 years had been a familiar formula in the law of insanity although not everywhere accepted as correct, was well understood as not embracing or recognizing the element of irresistible impulse, independent of the capacity to understand the nature and quality of the act committed, or its wrongfulness. The statute having been enacted in that form without modification, defining distinctly the conditions which alone shall afford exemption from criminal liability, the courts cannot declare that upon other grounds, also, one may be exempt from responsibility."[9]

Similarly, in other states where the M'Naghten rules have been re-enacted by statute,[10] the courts have declined to effect any change in the tests.[11] The court in the Durham case specifically stated that it

---

[7]See, also, M. S. A. 610.09, which provides in part: "A morbid propensity to commit prohibited acts existing in the mind of a person who is not shown to have been incapable of knowing that such acts were wrong shall constitute no defense."

[8]State v. Simenson, 195 Minn. 258, 262 N. W. 638; State v. Towers, 106 Minn. 105, 118 N. W. 361; State v. Scott, 41 Minn. 365, 43 N. W. 62. The same test was also applied prior to the enactment of § 610.10. See, State v. Gut, 13 Minn. 315 (341); State v. Shippey, 10 Minn. 178 (223).

[9]See, also, State v. Simenson, 195 Minn. 258, 262 N. W. 638.

[10]The statutes are listed in 1 Wharton, Criminal Law and Procedure, § 42, note 17.

[11]See, e. g., People v. Horton, 308 N. Y. 1, 123 N. E. (2d) 609; Berryman v. State (Okl. Cr.) 283 P. (2d) 558.

was able to adopt a new test only because Congress had not undertaken to define insanity.[12] Even in the absence of controlling statutes, at least one jurisdiction has insisted that the formulation of any new test is a legislative function.[13]

In Anderson v. Grasberg, 247 Minn. 538, 78 N. W. (2d) 450, a majority of this court held that, under the particular facts of that case, which was a civil matter involving the imposition of a constructive trust, the use of the right-and-wrong test was not appropriate. However, the court specifically stated (247 Minn. 555, footnote 21, 78 N. W. [2d] 461):

"We are not here concerned with the test to be applied in determining criminal responsibility; that question is controlled by § 610.10."

Consequently, the Anderson case, rather than serving as authority in support of defendant's contention, must be considered as a recognition of the exercise of legislative authority in the area of criminal responsibility.

Nor can it be said that we are authorized to make a change in the law by virtue of § 610.03, which, it is urged, gives the court wide discretion in interpreting statutes in accordance with advances in science. It provides:

"The rule that a penal statute is to be strictly construed shall not apply to any provision of Part V of the Minnesota Statutes, but every such provision shall be construed according to the fair import of its terms, to promote justice and effect the purpose of the law."

This section, which was intended to abolish the common-law rule that penal statutes must be strictly construed in favor of an accused, has no application in the instant case. While changing conditions can and often do affect the construction of statutes,[14] the courts cannot go beyond the plain and clear meaning of the statute to spell out some dif-

---

[12]See, Durham v. United States, 94 App. D. C. 228, 240, 214 F. (2d) 862, 874, 45 A. L. R. (2d) 1430, 1444.

[13]People v. Daugherty, 40 Cal. (2d) 876, 256 P. (2d) 911.

[14]See, 17 Dunnell, Dig. (3 ed.) § 8947a.

ferent meaning.[15] Section 610.10 simply does not require judicial construction. If more adequate standards of determining criminal responsibility can be devised, it is the function of the legislature and not this court.

■ The defendant asserts that the transcript of the trial is incomplete and poorly transcribed. Shortly after the trial, which was held in February 1956, the court reporter became incapacitated and was unable to transcribe her shorthand notes. After a number of hearings and attempts to obtain a transcript, the reporter's notes were sent, with defendant's consent, to a specialist in Denver, Colorado, for transcription. His typewritten transcript has now been certified as a settled case by the trial court as being reasonably complete and accurate.

Even assuming that the claimed errors and omissions did occur, the evidence that was admittedly received during the trial is amply sufficient to sustain the verdict under the law as it was given to the jury. Unlike the Federal rule, where it is incumbent upon the prosecution to prove the defendant sane beyond a reasonable doubt,[16] in this state the burden is on the defendant to establish the defense of insanity by a fair preponderance of the evidence.[17] In view of our conclusions upholding the correctness of the court's instructions, the alleged errors in the transcription of the testimony are of no consequence.

Affirmed.

---

[15]State v. End, 232 Minn. 266, 45 N. W. (2d) 378; M. S. A. 645.16; see Osaka Shosen Kaisha Line v. United States, 300 U. S. 98, 101, 57 S. Ct. 356, 358, 81 L. ed. 532, 535, where the court noted that "the object of all construction, whether of penal or other statutes, is to ascertain the legislative intent; and in penal statutes, as in those of a different character, 'if the language be clear, it is conclusive.' "

[16]Davis v. United States, 160 U. S. 469, 16 S. Ct. 353, 40 L. ed. 499; see, Durham v. United States, 94 App. D. C. 228, 236, footnote 21, 214 F. (2d) 862, 870, 45 A. L. R. (2d) 1430, 1440.

[17]M. S. A. 610.08; State v. Simenson, 195 Minn. 258, 262 N. W. 638; State v. Hanley, 34 Minn. 430, 26 N. W. 397.