Arlie Roy POPE, Appellant,

v.

STATE of Alaska, Appellee.

No. 1127.

Supreme Court of Alaska.

Dec. 21, 1970.

Rehearing Denied Feb. 25, 1971.

See 480 P.2d 697.

James R. Clouse, Jr., Anchorage, for appellant.

Harold W. Tobey, Dist. Atty., Richard R. Felton, Asst. Dist. Atty., Anchorage, G. Kent Edwards, Atty. Gen., Juneau, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

## OPINION

ERWIN, Justice.

Appellant, Pope, was convicted of second degree murder in connection with the death of one David Silva on July 9, 1968. According to his own testimony, he arose on that date at his usual hour and prepared himself for work. While driving to work he began to feel sick and decided to have only coffee in place of his usual breakfast. As appellant continued towards his job, the sickness became more severe and he decided to turn around and drive back to his motel. He testified that this condition of nervousness and sickness at his stomach had occurred with frequency in the period of time shortly before the shooting occurred.

After returning to his motel room, appellant consumed a little less than one-half of a pint of alcoholic beverage, remaining in his room and watching television. He made several attempts to reach his former wife, Irma Pope, and was at last successful.

However, Mrs. Pope refused to speak with him, slamming down the telephone. Appellant stated that the reason that he had attempted to call his former wife was that he felt really sick and was looking for help from someone.

After being rejected over the telephone, appellant described a strange feeling, "like something was spinning around the top of my head, from right to left, right underneath the skin against the skull and when you closed your eyes you could see—could see a streak of light coming around and around. * * *" He described the light as not being mean or anything, but the light said "kill him, kill him, kill him"—just kept repeating it; and finally he said it to himself and as soon as he did he felt very good and was not sick any more. Appellant further stated that after the lights had stopped in his head, he felt very sorry for David Silva because of what was going to happen; he did not think there was anything that he could do to prevent the killing of David Silva, and he knew he was going to do it, but he didn't yet know just how. When appellant finally agreed with the light in his head which told him to kill Silva, the nervousness disappeared, as did his upset stomach.

Appellant's recollection of the events that occurred after he left the motel was hazy and vague. He recalled only being near the parking lot at Anchorage Bedding and Furniture and next seeing the gun in his hand on the door ledge of his automobile. Appellant did not recall shooting the decedent, but only remembered watching the decedent sitting down and then lying backwards on the ground.

Officer Pavlovich was the first law enforcement officer to arrive on the scene. Upon arriving he observed the deceased, a woman at the head of the decedent, and another man, later identified as the appellant, alongside the decedent in either a squatting or kneeling position. Officer Pavlovich went over to the decedent, checked his pulse, and pronounced him dead. He next asked the woman what had happened. The woman, Mrs. Silva, indicated that appellant had shot Mr. Silva. In response to this, Pavlovich stood the appellant up and started to search him for weapons.

At this point in the sequence of events there is a dispute as to the actual occurrences. A Mr. McConnell testified that he observed Officer Pavlovich going over to appellant and questioning him for a minute or two before finally searching him for a weapon. The officer, on the other hand, testified that after he had examined Silva he immediately started to search appellant. Appellant's version of the story is that as he was being frisked by Officer Pavlovich, he was asked if he had a gun, to which he responded yes, that it was in the car. Officer Pavlovich claims that the information about the gun was volunteered by Pope and that no such question had been asked.

Mr. McConnell stated that after eliciting this information, Officer Pavlovich proceeded to appellant's car, with his arm on appellant's arm, to retrieve the weapon, which was located in the middle of the front seat. Officer Pavlovich stated that after Pope had volunteered the information as to the whereabouts of the gun, Pope proceeded to the automobile and Pavolich hurried to beat him to the car in an effort to retrieve the weapon.

On cross-examination Officer Pavlovich described the appellant's appearance as being dazed and testified that his feeling at the time was that appellant was not drunk, but either dazed or at least under the influence of alcohol—but he could not tell which. Officer Pavlovich further testified that although he detected nothing radically wrong with appellant, that is, appellant walked normally and spoke clearly and distinctly, albeit very slowly, he nevertheless seemed to be preoccupied. At another point in his testimony Pavlovich stated that he thought appellant was either under the influence of alcohol or in a state of shock. Furthermore, he was not sure whether appellant was in possession of his faculties at this time.

On August 5, 1968, Pope was indicted by the grand jury for first degree murder and arraigned immediately thereafter. Appellant entered a plea of not guilty, and the trial date was set for December 12, 1968, before the Honorable Edward V. Davis, Superior Court Judge. Prior to trial, on November 29, 1968, at the request of the prosecutor, a competency hearing was held. On January 16, 1969, the Superior Court entered an order to the effect that the appellant was competent to stand trial.

Because of continuances, trial did not begin until February 10, 1969. At that time the defendant appeared before the Honorable Ralph E. Moody, Judge of the Superior Court, rather than Edward V. Davis, to whom the case had been assigned originally. Timely objection was made by appellant to the unannounced change. On February 18, 1969, the jury returned a verdict of guilty of murder in the second degree. Notice of appeal was duly filed.

Appellant raises four specifications of error in the trial below. His first specification is that the court committed prejudicial error in reassigning appellant's case from Judge Davis to Judge Moody without giving appellant five days from the date of reassignment to consider and possibly file a peremptory challenge affidavit as provided in AS 22.20.022; his second, that the trial court erred in overruling the appellant's motion to suppress the evidence seized by Officer Pavlovich from the appellant's car prior to a lawful arrest; and his third, that the trial court incorrectly admitted the statements of appellant made prior to his being given the proper *Miranda* warnings and after he had become a suspect in the crime and had been substantially deprived of his freedom of action. Finally, he contends that the trial court should have ruled as a matter of law that the burden of proving sanity is on the state rather than the burden of proving insanity being upon the defendant, when there was some evidence in the record to indicate that sanity was at issue.

I

In his first claim of error, appellant contends that because of the assignment procedure used herein,[1] he did not have sufficient opportunity to determine and if necessary file an affidavit alleging he believed that he could not obtain a fair and impartial trial.

Trial proceeded on February 10, 1969, appellant making timely motion,[2] which motion was denied.

---

1. There was no advance notice to counsel of the reassignment of this case from Judge Davis to Judge Moody on the day of trial. It should be noted that subsequent to the trial herein this court in the case of Roberts v. State, 458 P.2d 340, 346 (Alaska 1969) pointed out the potential problems of such a practice in suggesting that this method of reassignment of a case should be avoided in the future:

    A method should be devised and utilized to make assignment of cases to judges sufficiently in advance of trial or hearing, with notice of the assignment being given to the parties, so that the parties can be afforded their rights under AS 22.20.022 without interfering with scheduled hearing or trial dates.

2. The motion was as follows:

    Mr. Clouse: Your Honor, for the record, at this time, I would like to state an objection to the Court's requiring us to go to trial at this time and not be-

for the—Judge Davis who was previously assigned this case. This deprives the defendant of the opportunity to investigate and exercise any challenge that he may have within the five day period as provided by rule and statute.

The Court: Motion's denied since this is merely a procedural matter and it delays the—delays the carrying on of Court business if we give effect to that for the five days rule. Other than the objection, is defense ready to proceed?

Mr. Clouse: Yes, your Honor.

AS 22.20.022 states in relevant part:

*"Peremptory disqualification of a superior court judge.* (a) If a party or his attorney in a superior court action, civil or criminal, files an affidavit alleging under oath that he believes that he cannot obtain a fair and impartial trial, the presiding judge shall at once, and without requiring proof, assign the action to another judge of that district,

Appellant correctly points out that the granting of the five-day period is to allow a party or his attorney an opportunity to investigate the judge to whom the case is assigned and if necessary file the requisite affidavit for disqualification, thus avoiding the waste of judicial time which would result if an affidavit or disqualification were not filed until the date of trial because this would mean that the case would have to be continued until another judge could be assigned and the disqualified judge would not be ready at that time to start the trial of another action.[3] Appellant further correctly argues that the provisions of this statute have been interpreted by this court to mean that once the affidavit is filed, the judge involved is without power or jurisdiction to take any further action in the proceeding. Channel Flying Inc. v. Bernhardt, 451 P.2d 570 (Alaska 1969).

But appellant has not shown that any harm resulted to him from the denial of his motion. Instead, he invites us to speculate that he suffered some possible prejudice, even though he did not challenge the trial judge because he felt that any challenge he made might have a prejudicial effect on the jury. The gist of appellant's argument appears to be that since any challenge might affect the jury he never seriously considered whether or not he should exercise the challenge because the reassignment made the choice more difficult. Since appellant could have exercised the challenge at any time within five days of reassignment, even during trial, we hold that his failure to do so was a waiver of his right to a peremptory challenge to the trial judge, and it was not error for the court to refuse to grant a continuance of five days to permit appellant to ponder this matter at length.

## II

Appellant claims that the trial court committed error in refusing to suppress as evidence (1) appellant's oral statement about the gun, and (2) the gun itself, which the officer seized in appellant's car. The argument is that this evidence is tainted because the required warnings under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966) were not given by the officer until after the seizure of the gun, that appellant had already become a suspect in the crime, and that he had been substantially deprived of his freedom in a significant way. The test of when warnings must be given under Miranda is whether the accused has been "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

We need not explore such problems as whether the "in custody" test of Miranda displaces the "focus" test of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964), or whether the two tests can be regarded as alternatives to some extent.[4] For it is plain to us that this case falls within an important exception stated by the court in its opinion in Miranda. After pointing out that it did not intend to hamper the traditional function of police officers in investigating crime, the court said:

General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-

---

or if there is none, the chief justice of the supreme court shall assign a judge for the hearing or trial of the action. The affidavit shall contain a statement that it is made in good faith and not for the purpose of delay."

\* \* \* \* \*

"(c) The affidavit shall be filed within five days after the case is at issue upon a question of fact, or within five days after the issue is assigned to a judge,

whichever event occurs later, unless good cause is shown for the failure to file it within that time."

3. Roberts v. State, 458 P.2d 340, 346 (Alaska 1969).

4. United States v. Hall, 421 F.2d 540 (2nd Cir. 1969); Graham, What is Custodial Interrogation?: California's Anticipatory Application of Miranda v. Arizona, 14 U.C.L.A.L.Rev. 59, 114–15.

finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present. 384 U.S. at 477–478, 86 S.Ct. at 1629–1630, 16 L.Ed.2d at 725–726.

In interpreting *Miranda* various courts have had to draw lines between what are permissible investigative interviews and custodial interrogations. The United States Supreme Court itself has made it plain that custodial interrogation could take place outside the station-house where one was "not free to go where he pleased but was 'under arrest.'" Orozco v. Texas, 394 U.S. 324, 325, 89 S.Ct. 1095, 1096, 22 L. Ed.2d 311, 314 (1969). The courts must determine, therefore in each case whether the atmosphere and setting of an interrogation are of such coercive effect or indicate such significant restraint as to trigger the need for a *Miranda* warning. There is not always agreement about the criteria for such a determination.

■ But the case at bar is a strong one for applying the "on-the-scene questioning" exception to the *Miranda* warning requirement. The officer here was presented with a situation of great emergency. A crime of violence had occurred, the victim was lying on the ground dead. There was more than one person present. Both to protect his own safety and that of others, the officer had to elicit information about what had happened, and about the gun which had obviously been used in the killing. For the same reason the officer also had the right to conduct a strictly limited search ("frisk") of Pope's person for weapons under the rule of Terry v. Ohio, 392 U.S. 1, 88 'S.Ct. 1868, 20 L.Ed.

2d 889 (1968), which he did.[5] To hold that, that while a policeman faced with an emergency such as the one which confronted Officer Pavlovich may "frisk" a suspect for weapons he may not simultaneously ask him whether he is armed, would be an unrealistic and unreasonable extension of the *Miranda* rule.

■ Appellant also contends that, because the revolver was seized from Pope's automobile prior to the time he was placed under arrest, it was inadmissible because it was not the product of a search incident to arrest. The difficulty with this line of argument is that the gun was not the product of a "search" at all; it was lying on the front seat of the car in plain view. As soon as he saw it, Officer Pavlovich seized it and unloaded it, both to preserve it and its cartridges as evidence and to prevent appellant, who was standing beside him, from getting hold of it. His conduct was entirely justified.

It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.[6]

### III

The final point raised by appellant is a challenge to the burden of proof in insanity cases as set forth in the opinion of this court in Chase v. State.[7] A review of the record reveals that the only testimony before this court in reviewing this point is the testimony of Officer Pavlovich, the appellant, Pope, Bill McConnell, and the cross-examination of appellant's ex-wife. Testimony given by Dr. J. Ray Langdon, a psychiatrist, and Marie Doyle, a psychologist, at the trial, as well as the testimony of additional police officers and others at the scene of the crime, was not made a part of the record on appeal.

5. *See* Maze v. State, 425 P.2d 235, 238 (Alaska 1967).

6. Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067, 1069 (1968) ; Creighton v. United States, 132 U.S.App.D.C. 115, 406 F.2d 651 (1968) ; Klockenbrink v. State, 472 P.2d 958, 961 (Alaska 1970). *See* Stevens v. State, 443 P.2d 600, 602 (Alaska 1968).

7. 369 P.2d 997, 1003 (Alaska 1962).

While proper objections were made at the trial concerning burden of proof in insanity cases, no objection was made to instructions on the test for insanity as given by the trial court, nor was any testimony presented nor instructions requested concerning such an issue.

■ Since in our opinion the burden of proof as to the defense of insanity and the actual test for insanity are inseparably intertwined,[8] we are placed in the position of attempting to review the entire basis for the present rule on the defense of insanity in Alaska on an inadequate record without complete presentation of these issues to the trial court. This we decline to do.[9]

The importance of the defense of insanity has been underscored recently by a series of excellent opinions in federal courts which have considered, and in many cases adopted, the A.L.I. test for insanity,[10] and a series of equally searching state court opinions which have noted more than one position, but have tended to retain the *M'Naghten* rule.[11] These opinions note that there are presently four separate tests for insanity [12] which have received vary-

ing degrees of judicial acceptance. They serve to underscore the difficulty of choosing a proper test for insanity and the corresponding burden of proof without complete presentation on the issue in the trial court and ultimately in this court.[13]

The judgment of the Superior Court is hereby affirmed.

CONNOR, Justice (concurring in part and dissenting in part).

I concur with the majority opinion except the portion dealing with the burden of proof in insanity cases, and allied questions. As to that portion of the majority opinion I must respectfully dissent.

This case went to the jury on instructions concerning the defense of insanity which were patterned on those approved by this court in Chase v. State, 369 P.2d 997 (Alaska 1962). Counsel for appellant objected to those instructions as improperly placing the burden on the accused to establish his insanity by a preponderance of the evidence. He thus raised and preserved for appeal the questions of what is the burden of proof and where it should be placed in

8. Approximately one-half of the states put the burden on the defendant while the other half and the federal courts put the basic burden on the prosecution. See annot. 17 A.L.R.3rd 146 (1968).

9. For a similar action by a federal court, see Ramer v. United States, 390 F.2d 564 (9th Cir. 1968).

10. Wade v. United States, 426 F.2d 64 (9th Cir. 1970); Blake v. United States, 407 F.2d 908 (5th Cir. 1969); United States v. Chandler, 393 F.2d 926 (4th Cir. 1968); United States v. Shapiro, 383 F.2d 680 (7th Cir. 1967); Pope v. United States, 372 F.2d 710 (8th Cir. 1967), vacated on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); United States v. Freeman, 357 F.2d 606 (2nd Cir. 1966); Wion v. United States, 325 F.2d 420 (10th Cir. 1963), cert. denied 377 U.S. 946, 84 S. Ct. 1354, 12 L.Ed.2d 309 (1964); United States v. Smith, 404 F.2d 720 (6th Cir. 1968).

11. FOR A.L.I.: State v. White, 93 Idaho 153, 456 P.2d 797 (1969).
    FOR M'NAGHTEN: State v. Malumphy, 461 P.2d 677 (Ariz.1969); State

v. Moeller, 433 P.2d 136 (Hawaii 1967); State v. Harkness, 160 N.W.2d 324 (Iowa 1968); Williams v. State, 451 P.2d 848, 851 (Nev.1969); State v. Gilmore, 242 Or. 463, 410 P.2d 240 (1966); Commonwealth v. Rightnour, 435 Pa. 104, 253 A.2d 644 (1969) (Aff'd by equally divided court).

2. (1) The M'Naghten Test, Daniel M'Naghten case, 8 Eng.Rep. 718 (H.L. 1843).
   (2) Durham Test, Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954).
   (3) American Law Institute Test, American Law Institute, Model Penal Code, Section 4.01(1) (Final Draft 1962).
   (4) English Test, British Royal Commission on Capital Punishment, 1949–1953, 1953 Report at page 116, quoted in United States v. Currens, 290 F.2d 751, 774, n. 32 (3rd Cir. 1961).

13. Once before this court has refused to review the test for insanity for Alaska based on an inadequate record. See Dimmick v. State, 449 P.2d 774, 776 (Alaska 1969).

these cases. He is properly entitled to a decision on those questions.

The majority of my colleagues feel that the burden of proof question and the substantive test of insanity are interrelated. I agree. But for that very reason I believe that both topics logically can, and properly should, be determined by the court.[1]

The lack of an adversary presentation of the legal arguments bearing upon the proper test of insanity in criminal cases should not be an impediment to decision in this particular instance. Ultimately one must read a large body of legal and psychiatric material even to become conversant with these subjects. Appellate briefs are of much less value here than in the resolution of more usual questions.[2] Surely this would not be the first time that this court decided a case on grounds or under a doctrine not fully presented in the briefs.[3]

There is another reason why we should decide these questions now, not later. In my opinion the test currently obtaining under Chase v. State, supra, is so inherently unfair as to dissuade either defendants or their counsel from raising the defense of insanity, or adducing evidence in support of it. Thus it is difficult to get the insanity question before us on appeal.

The insanity defense is much like a confession and avoidance. One virtually admits all factual elements of the crime but claims insanity as a special ground of exoneration. One claiming that he did not commit the offense, but who alternatively claims that he was insane when he did commit it, has little hope of success. While such an approach is procedurally permissible, as a practical matter it is a foolhardy strategy. A person invoking the Alaska rule on insanity, even in a strong case, has almost precluded himself from an acquittal. The current test thus exerts a chilling effect upon one who might seek a change in the law through the appellate process. This is true even though he may have suffered from serious mental illness, of a psychotic type, at the time he committed the act with which he is charged. Because of the *in terrorem* effect of the current Alaska test, I see no reason to postpone corrective measures, especially if we believe that the test can be improved.

I

All discussion of the tests of criminal responsibility inevitably must refer to *M'Naghten's Case,* 10 Cl. & Fin. 200, 8 Eng.Rep. 718 (1843), which is regarded as the English source of the rule followed in most American jurisdictions for over a century. In that case Daniel M'Naghten attempted to assassinate Robert Peel, the Prime Minister. Because Peel, on the fatal day, happened to ride in Queen Victoria's carriage instead of his own, M'Naghten shot into the wrong carriage and killed Drummond, Peel's secretary. From all of the available information it seems quite plain that M'Naghten was suffering from psychotic delusions of persecution. At his trial Lord Chief Justice Tindal virtually directed a verdict in his favor.[4]

1. For a case in which a distinguished court took a relaxed view of the manner in which counsel raised the question of the proper test of insanity in the trial court, see United States v. Freeman, 357 F.2d 606 (2d Cir. 1966). The failure of trial counsel in that case to object to the insanity test itself was not deemed critical.

2. The question of the test of insanity as a criminal defense has already been briefed in Chase v. State, 369 P.2d 997 (Alaska 1962). There the state urged that if the M'Naghten test was not employed, the American Law Institute test

(discussed later herein) would be the most suitable.

3. One such case was Grossman v. State, 457 P.2d 226 (Alaska 1969), adopting an objective standard of entrapment, though neither party directly briefed that doctrine. Surely others could be found by searching the briefs and comparing them with the opinions rendered by this court during the last ten years.

4. Guttmacher & Weihofen, Psychiatry and the Law, 403 (1952); Roche, "Criminality and Mental Illness—Two Faces on the Same Coin," 22 U.Chi.L.Rev. 320, 324

At the trial the medical witnesses and the court had been influenced by the writings and theories of such advanced thinkers as Dr. Isaac Ray, the first great forensic psychiatrist in America. It was Dr. Ray's thesis that insanity must be measured by evaluating the entire personality structure of an individual, and not by tests such as merely the ability to know right from wrong.[5] At any rate, M'Naghten was acquitted. Unfortunately for the development of law, the case did not end there.

Despite commitment of the hapless M'Naghten to an insane asylum, Queen Victoria was outraged by the acquittal, probably because there had already been three attempts on her life and one on that of the Prince Consort. In a letter to Sir Robert Peel, the Queen deplored the action of the judges in allowing verdicts of not guilty by reason of insanity in cases of this kind because she was convinced that such malefactors "were perfectly conscious and aware of what they did." She pressed for legislation to require judges "to interpret the law in this and no other sense in their charges to the Juries."[6] The House of Lords was convened, and the fifteen judges of the common law courts were called upon, in an atmosphere of political pressure, to answer five rather vacuous questions about criminal responsibility in English law. Interestingly enough, it was Lord Chief Justice Tindal who responded with a test more rigid than that which he had used when M'Naghten was tried before him. The *M'Naghten* rule in essence is:

"[T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing: or, if he did know it, that he did not know he was doing what was wrong." 10 Cl. & Fin., at 210, 8 Eng.Rep., at 722.

Thus, in a case which was no longer a case, in response to hypothetical questions based on notions of phrenology and monomania which were then in vogue, the judges, in a dramatic departure from common law decisional technique, acting more as a governmental committee than a court, pronounced a rule which has been followed unthinkingly by many courts ever since. Of little avail was the restrained observation of Sir James Stephen that "every judgment delivered since the year 1843 has been founded upon an authority which deserves to be described as in many ways doubtful."[7] The test could at least have been limited to cases of paranoia like that suffered by M'Naghten, but instead it was applied by many courts as a rule of universal and implacable validity, appropriate for all types of mental and emotional derangement.

The *M'Naghten* test has been supplemented in many jurisdictions by the "irresistible impulse" test, under which one suffering from a mental disease, of such severity that the freedom of will is destroyed, may be excused from culpability.[8]

In Alaska, before statehood, the right-and-wrong test, supplemented by the irresistible impulse test, was considered the applicable rule.[9] In Chase v. State, 369 P.

---

(1955) ; Biggs, The Guilty Mind, 95–97, 102 (1955).

5. Dr. Ray's views have a modern ring. "[T]he insane mind is not entirely deprived of * * * power of moral discernment, but on many subjects is perfectly rational and displays the exercise of a sound and well balanced mind." Ray, Medical Jurisprudence of Insanity 13 (3d ed. 1853).

6. Biggs, supra n. 4, 103.

7. II Stephen, History of the Criminal Law of England 153 (1883).

8. As of 1955, about 14 states, and the federal judiciary, had adopted the irresistible impulse addition to the test. Mod.Penal Code, Tent.Dr. No. 4,161 (1955).

9. Matheson v. United States, 227 U.S. 540, 33 S.Ct. 355, 57 L.Ed. 631 (1913) ; Davis v. United States, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750 (1897) ; Sauer v.

2d 997 (Alaska 1962), however, this court adopted a particular version of what it regarded as the *M'Naghten* rule. The test laid down there was that in order to exculpate the defendant he must be laboring under such mental disease or derangement at the time of the act "as to render him incapable of knowing the nature and quality of his act *and* of distinguishing between right and wrong in relation to the act with which he is charged." 369 P.2d, at 998. (Emphasis supplied.) This results in a formulation more rigid than the *M'Naghten* test, and without the irresistible impulse supplement which had previously obtained in Alaska.[10] In that sense the *Chase* case is a retrograde decision in a time of generally forward legal progress.[11]

The court in *Chase* relied on three cases: Jessner v. State, 202 Wis. 184, 231 N.W. 634, 71 A.L.R. 1005 (1930); Maas v. Territory, 10 Okl. 714, 63 P. 960 (1901); and Montgomery v. State, 68 Tex.Crim. 78, 151 S.W. 813 (1912). As the Note, "Criminal Insanity," UCLA–Alaska L.Rev., 8 Alaska L.J. 152, 153–54 (Aug. 1970), points out, these cases were decided before many of the modern advances in psychiatry had been widely disseminated. Moreover, the instructions given in these cases lacked

clarity and therefore were extremely confusing. *Jessner* and *Montgomery* indeed held that the phrases "the nature and quality of the act" and "the difference between right and wrong" were synonymous; if the defendant could not understand the one, he could not distinguish the other. However, as the Note, *supra,* indicates, these phrases are not at all synonymous in ordinary speech.

To torture English into performing such a linguistic cakewalk requires unusual skill. Since juries are composed of but ordinary reasonable laymen, additional complicated instructions would have to be given to insure that the jury does not consider the terms according to their usage in common everyday speech and thereby misapply the law. Such verbal gymnastics should not be employed in jury instructions. The purpose of jury instructions is to instruct and enlighten the jury on the law, not to confuse them.[12]

It also appears that the instructions in *Jessner* focused solely on the defendant's ability to distinguish between right and wrong, ignoring completely his ability to understand the nature and quality of his act.[13] In *Maas,* the actual instruction did follow the disjunctive form of the *M'Nagh-*

---

United States, 241 F.2d 640 (1957), cert. denied 354 U.S. 940, 77 S.Ct. 1405, 1 L. Ed.2d 1539; Rivers v. United States, 270 F.2d 435 (1959).

10. That the Alaska test is more restrictive than M'Naghten is apparent from the following example. One laboring under a psychotic delusion, such as that he is being persecuted or that God has ordained that he must kill, may well know the nature of the act committed, yet not be able to appreciate its wrongfulness. Under M'Naghten he would not be culpable, but under Chase he could not be acquitted. *Cf.* People v. Schmidt, 216 N.Y. 324, 110 N.E. 945 (1915), per Cardozo, J.

11. Speculation persists in Alaska legal circles that the use of the conjunctive "and" in the instructions which were validated in Chase possibly came about through a typographical error by the secretary to the trial court judge. If this is so, then

Chase is no less an historical accident than M'Naghten's Case.

12. "But 'glory' doesn't mean 'a nice knockdown argument,' " Alice objected.
    "When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean—neither more nor less."
    "The question is," said Alice, "whether you *can* make words mean so many different things."
    "The question is," said Humpty Dumpty, "which is to be master—that's all."
    L. Carroll, Through the Looking Glass, in The Annotated Alice 269 (1960).
    This nonsensical repartee brings sharply into focus a problem which has plagued logicians since at least the time of William of Occam. A lack of awareness of this problem has led to much mischief in legal interpretation.

13. 202 Wis. at 196, 231 N.W. at 639.

*ten* test.[14] If anything, this case stands for an adoption of the true *M'Naghten* rule, not the rule of *Chase*. In sum, I do not find any of these cases of sufficient precedential value to warrant an adherence by this court to what is little more than a modified "wild beast" test.[15]

Since the *M'Naghten* case, and even in the eight years since Chase v. State was decided, a great deal of critical evaluation and development has occurred, in an effort to achieve more advanced and just techniques for handling this serious problem.

The torrent of legal writing is so vast that it is nearly impossible for all but a few to read or comprehend everything which has been said on this basic issue of criminal responsibility. Still, certain broad outlines can be stated. There is nearly universal dissatisfaction with the *M'Naghten* rule on the part of scholars, jurists, and psychiatrists who have seriously inquired into the subject. The main difficulty with the *M'Naghten* rule is that it focuses exclusively on the cognitive element in mental life, that is, the knowledge of right and wrong or of the nature of one's act. One of its underlying assumptions is that mental illness is a failure of intellectual function. This reflects an artificial dualism of mind and emotions which ignores the affective aspects of the human personality. While there are many schools of psychiatric thought, there is broad agreement that mental illness can be understood only by looking at man as an integrated, psychobiological whole.[16] Because the *M'Naghten* rule views man within the artificial strictures of cognition, courts and juries are deprived of much of the benefit to be gained from the modern science of psychiatry.[17]

Other criticisms of the *M'Naghten* rule would probably be applicable to any verbal formulation.[18] The difficulty stems from the different functions and purposes of law and psychiatry. The aim of psychiatry is to examine human behavior and mental disease in a scientific manner and to develop therapeutic methods of dealing with the emotional problems of mankind. On the other hand, it is the task of the law to develop normative rules to control human behavior. It has always been recognized that certain persons must be regarded as not the proper subjects of criminal conviction, and that because of their mental aberrations it would be unjust to hold them responsible for their conduct.[19] Ultimately this is an ethical and social judgment and not a medical determination.

Scholars and jurists have expended great effort over the years to achieve a standard reflecting both society's need for criminal accountability and the converse demand for a rule flexible enough to cover the varieties and combinations of serious emotional and mental illness which destroy the capacity to commit a crime, in any just conception of the term.

One great developmental breakthrough occurred with the famous decision in Durham v. United States, 94 U.S.App.D.C. 228,

14. 10 Okl. at 717, 63 P. at 961.

15. Rex v. Arnold, 16 How.St.Tr. 695, 764 (1724).

16. "Psychiatry may be defined as that branch of medicine which deals with the genesis, dynamics, manifestations and treatment of such disordered and undesirable functionings of the personality as disturb either the subjective life of the individual or his relations with other persons or with society. * * * Viewed a little differently, psychiatry may be regarded as the science which deals with the psychopathological aspect of human biology. The latter considers man not only as a living organism but also as a thinking, feeling and striving one." Noyes & Kolb, Modern Clinical Psychiatry (5th Ed. 1958), 1.

17. P. Roche, The Criminal Mind (1957), 168–195, 244–274.

18. F. Allen, The Borderland of Criminal Justice (1964), 111.

19. A. Platt & B. Diamond, "The Origins of the 'Right and Wrong' Test of Criminal Responsibility and Its Subsequent Development in the United States: An Historical Survey," 54 Calif.L.Rev. 1227 (1966). In early law the "insane" were considered homologous to children.

214 F.2d 862 (1954). There Judge Bazelon laid down a test under which a defendant was to be held not responsible "if his unlawful act was the product of mental disease or mental defect." 214 F.2d at 874. This was an adaptation of a rule which had previously existed solely in New Hampshire, and which had developed under the influential work of Dr. Ray. State v. Pike, 49 N.H. 399 (1870). While *Durham* represents a courageous attempt to state a modern standard of responsibility, certain deficiencies were encountered in its administration. For example, the use of the term "product" created difficult problems of causation.[20] And as Judge (now Chief Justice) Burger complained, concurring in Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853, 860 (1960), the test in many cases put the legal determination in the hands of psychiatric witnesses rather than judge and jury. Finally, in Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967), Judge Bazelon noted certain shortcomings of the *Durham* test, in that it allowed the psychiatrist to make too many legal and moral judgments which should be within the province of the jury. In substance, he appears to have acceded at least partially to the view of Judge Burger that psychiatrists should no longer be permitted to render an opinion on whether the act was a "product" of mental disease. A lengthy form of instruction was adopted to clarify the respective functions of expert witness and jury.

Shortly after the *Durham* rule was announced, the American Law Institute pro-mulgated a draft rule on this subject. This rule represents the collective efforts of some of the leading thinkers in this field. After nine years of research and consideration, the proposed rule was stated as follows:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

"(2) The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

A.L.I. Mod. P. Code § 4.01 (final draft) (1962).

Since then this test, or some variant of it, has met with increasing judicial acceptance, particularly in the federal courts. In a luminous opinion by Judge Kaufman, the Second Circuit adopted the test in United States v. Freeman, 357 F.2d 606 (2nd Cir. 1966). Chief Judge Haynsworth adopted it for the Fourth Circuit in United States v. Chandler, 393 F.2d 920 (4th Cir. 1968) (en banc), and the Ninth Circuit has now embraced it in Wade v. United States, 426 F.2d 64 (9th Cir. 1970) (en banc). The *M'Naghten* test has now been overthrown in all but the First Circuit.[21] These cases contain excellent disquisitions on the *M'Naghten* rule, its deficiencies, and the legal and psychiatric framework underly-

---

20. Weihofen, "The Flowering of New Hampshire," 22 U. of Chi.L.Rev. 356, 360 (1955).

21. In addition to the above cited cases, see United States v. Currens, 290 F.2d 751 (3rd Cir. 1961); Blake v. United States, 407 F.2d 908 (5th Cir. 1969) (en banc); United States v. Smith, 404 F.2d 720 (6th Cir. 1968); United States v. Shapiro, 393 F.2d 680 (7th Cir. 1967) (en banc); Pope v. United States, 372 F.2d 710 (8th Cir. 1967) (en banc), vacated on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); Wion v. United States, 325 F.2d 420 (10th Cir. 1963) (en banc), cert. denied, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964). While not all of these cases embrace the A.L.I. test totally, they reject the M'Naghten rule and include a test whereby the effect of mental illness on one's capacity to conform his conduct to law is stressed. Judge (now Chief Justice) Burger, in his separate concurring opinion in Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853 (1960), laid great emphasis on a test which would focus on the relationship between mental illness and one's *capacity* to refrain from wrongdoing.

ing the A.L.I. test. As Chief Judge Haynsworth said of the A.L.I. test:

"With appropriate balance between cognition and volition, it demands an unrestricted inquiry into the whole personality of a defendant who surmounts the threshold question of doubt of his responsibility. Its verbiage is understandable by psychiatrists; it imposes no limitation upon their testimony, and yet, to a substantial extent, it avoids a diagnostic approach and leaves the jury free to make its findings in terms of a standard which society prescribes and juries may apply. [Footnotes omitted.]" United States v. Chandler, *supra*, 393 F.2d at 926.

This wide acceptance of the American Law Institute test is significant. I believe that this formulation affords a workable standard, permitting realistic expert testimony about the personality and characteristics of the defendant as a whole man, but leaving to the court and jury the ultimate legal pronouncement. It avoids many of the problems encountered under the *Durham* rule.

No verbal formulation of this standard can achieve perfection, as there may always be doubt about the application of general terms to marginal situations. Yet the American Law Institute standard, in the view of many, does represent the best in current thinking on this subject. It is the standard which should be employed in Alaska.[22] I regard it unfortunate that we are not taking this step today.

II

Appellant has raised the question of where the burden of proof should be placed in these cases. In Chase v. State, *supra*, this court adopted the rule that the burden was on the defendant to establish his insanity by a preponderance of the evidence. Approximately one-half of the states follow this rule.[23] But in the rest of the states, and in the federal courts, the accused need only show some evidence of insanity. The prosecution must then prove his sanity beyond a reasonable doubt.[24]

22. The standard need not be frozen entirely within only one rigid form of words. In appropriate cases the testimony might require some amplification of the test in the instructions to the jury. Nor is this an occasion to consider the undue resort to diagnostic labels and conclusionary medical terms which plagued the court under the Durham rule and which the court sought to limit in Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967). Hopefully, care would be taken to see that experts explain such labels and terms in language understandable to the jury.

23. Alabama, Knight v. State, 273 Ala. 480, 142 So.2d 899 (1962); Alaska, Chase v. State, 369 P.2d 997 (Alaska 1962); Arkansas, Kelley v. State, 154 Ark. 246, 242 S.W. 572 (1922); California, People v. Monk, 56 Cal.2d 288, 14 Cal.Rptr. 633, 363 P.2d 865 (1961); Delaware, Longoria v. State, 3 Storey 311, 53 Del. 311, 168 A.2d 695 (1961); Georgia, Ross v. State, 217 Ga. 569, 124 S.E.2d 280 (1962); Iowa, State v. Drosos, 253 Iowa 1152, 114 N.W.2d 526 (1962); Kentucky, Tunget v. Commonwealth, 303 Ky. 834, 198 S.W.2d 785 (1947); Maine, State v. Park, 159 Me. 328, 193 A.2d 1 (1963);

Minnesota, State v. Finn, 257 Minn. 138, 100 N.W.2d 508 (1960); Missouri, State v. King, 375 S.W.2d 34 (Mo.1964); Montana, State v. DeHann, 88 Mont. 407, 292 P. 1109 (1930); Nevada, State v. Behiter, 55 Nev. 236, 29 P.2d 1000 (1934); New Jersey, State v. Kudzinowski, 106 N.J.L. 155, 147 A. 453 (1929); North Carolina, State v. Swink, 229 N.C. 123, 47 S.E.2d 852 (1948); Ohio, State v. Stewart, 176 Ohio St. 156, 198 N.E.2d 439 (1964); Oregon, 14 Or.Rev.Stat. 136.390 (1960); Pennsylvania, Commonwealth v. Updegrove, 413 Pa. 599, 198 A.2d 534 (1964); Rhode Island, State v. Gannites, 161 A.2d 818 (R.I.1960); South Carolina, State v. Tidwell, 100 S. C. 248, 84 S.E. 778 (1915); Texas, Wenck v. State, 238 S.W.2d 793 (Tex.Cr.App. 1951); Virginia, Christian v. Commonwealth, 202 Va. 311, 117 S.E.2d 72 (1960); Washington, State v. Mays, 65 Wash.2d 58, 395 P.2d 758 (1965); West Virginia, State v. McCauley, 43 S.E.2d 454 (W.Va.1947). See 17 A.L.R.3d 146 (1968).

24. Those states following the federal rule are: Arizona, State v. Schantz, 98 Ariz. 200, 403 P.2d 521 (1965); Colorado, Castro v. People, 140 Colo. 493, 346 P.2d

Those who place the burden of establishing sanity on the defendant usually argue that this accords with the presumption of sanity. Because there is a presumption, it is said that the prosecution should not be put to proving that which normally is not imposed upon it. But under the federal rule, the presumption of sanity is still employed. It is operative until some evidence is produced which adequately brings into issue the sanity of the defendant. The presumption then disappears and the mental capacity of the defendant to commit the crime becomes an essential element, to be proved beyond a reasonable doubt, like any other.[25]

It has been said that the burden of establishing insanity should be placed on the accused because sanity is not an element of the offense but a quality of the one who commits it. Chase v. State, *supra*, 369 P.2d at 1003. But this overlooks the important consideration that once sanity is in issue it is a fact to be established like any other ultimate fact essential to culpability. The United States Supreme Court made this plain in Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), when it said:

"No man should be deprived of his life under the forms of law unless the jurors who try him are able, upon their consciences, to say that the evidence before them, by whomsoever adduced, is sufficient to show *beyond a reasonable doubt* the existence of *every fact necessary* to constitute the crime charged." (Emphasis supplied.) 160 U.S. at 493, 16 S.Ct. at 360.

Realistically speaking, when sanity is an issue, it is not only a major element of the criminal proof, it may be the central factual issue in the case. For that matter, it may be the only issue. Logically, sanity is an essential element of a crime because *mens rea* is a necessary primary factor. If insanity exists at the time of the criminal act, *mens rea* fails, there is no jointure of act and intent, and under the traditional analysis no crime has been committed. As Mr. Justice Frankfurter noted, dissenting in Leland v. Oregon, 343 U.S. 790, 803, 72 S.Ct. 1002, 1009, 96 L.Ed. 1302 (1952):

"Even though a person be the immediate occasion of another's death, he is not

1020 (1959); Connecticut, State v. Joseph, 96 Conn. 637, 115 A. 85 (1921); Florida, Farrell v. State, 101 So.2d 130 (Fla.1958); Hawaii, State v. Moeller, 433 P.2d 136 (Hawaii 1967); Idaho, State v. Clokey, 83 Idaho 322, 364 P.2d 159 (1961); Illinois, People v. Robinson, 22 Ill.2d 162, 174 N.E.2d 820 (1961); Indiana, Whitaker v. State, 240 Ind. 676, 168 N.E.2d 212 (1960); Kansas, State v. Penry, 189 Kan. 243, 368 P.2d 60 (1962); Maryland, Jenkins v. State, 238 Md. 451, 209 A.2d 616 (1965); Massachusetts, Commonwealth v. McHoul, 352 Mass. 544, 226 N.E.2d 556 (1967); Michigan, People v. Eggleston, 186 Mich. 510, 152 N.W. 944 (1915); Mississippi, McGarrh v. State, 249 Miss. 247, 148 So.2d 494 (1963); Nebraska, Thompson v. State, 159 Neb. 685, 68 N.W.2d 267 (1955); North Dakota, State v. Barry, 11 N.D. 428, 92 N.W. 809 (1902); New Hampshire, State v. Bartlett, 43 N.H. 224 (N.H.1861); New Mexico, State v. Roy, 40 N.M. 397, 60 P.2d 646 (1936); New York, People v. Kelly, 302 N.Y. 512, 99 N.E.2d 552 (1951); Oklahoma, Whisenhunt v. State, 279 P.2d 366 (Okl. Cr.1954); South Dakota, State v. Waugh, 80 S.D. 503, 127 N.W.2d 429 (1964); Tennessee, Jordan v. State, 124 Tenn. 81, 135 S.W. 327 (1911); Utah, State v. Green, 86 Utah 192, 40 P.2d 961 (1935); Wisconsin, State v. Esser, 16 Wis.2d 567, 115 N.W.2d 505 (1962); Wyoming, State v. Pressler, 16 Wyo. 214, 92 P. 806 (1907). The District of Columbia also follows this rule: Jones v. United States, 109 U.S.App.D.C. 111, 284 F.2d 245 (1960). See 17 A.L.R.3d 146 (1968).

25. Fitts v. United States, 284 F.2d 108 (10th Cir. 1960). There the court said: "When, however, evidence of insanity is produced, from whatever source, the presumption of sanity disappears, and the mental capacity of the accused to commit the crime becomes an essential element to be proved by competent evidence beyond a reasonable doubt." 284 F.2d at 112.
This is the general rule which is followed in approximately one-half or more of the jurisdictions of the United States.

a deodand to be forfeited like a thing in the medieval law. Behind a muscular contraction resulting in another's death there must be culpability to turn homicide into murder."

Placing the burden on the prosecution has substantial advantages. First, it accords with the presumption of innocence and the thesis that the accused need not undertake to prove anything in a criminal case.[26]

An additional advantage is that the jury is not given the confusing task of juggling two different burdens, each of which carries a different standard. This anomaly is pointed out by Professor McCormick:

"Thus it seems inconsistent to demand as to some elements of guilt, such as an act of killing, that the jury be convinced beyond a reasonable doubt, and as to others, such as duress or capacity to know right from wrong, the jury may convict though they have such doubt. Accordingly, the recent trend both in English and American decisions is to treat these so-called matters of defense as situations wherein the accused will usually have the first burden of producing evidence in order that the issue be raised and submitted to the jury, but at the close of the evidence the jury must be told that if they have a reasonable doubt of the fact on which the justification is based they must acquit." McCormick, Evidence § 321, p. 684 (1954). (Footnote omitted.)

There are also important aspects of constitutional policy to be weighed in the balance. It has been held unconstitutional to shift the burden of persuasion on the defense of alibi to the accused. Stump v. Bennett, 398 F.2d 111 (8th Cir. 1968) (en banc), and cases cited therein. This may or may not represent some future trend.

But when it comes to shifting burdens, there is not much difference between proof that a defendant was physically present, and not elsewhere, at the commission of a crime, and that he was "mentally present," in the sense that he was sane.

Lastly, the experience of the federal courts, in their treatment of the burden of persuasion, is of value. The federal courts have worked under the rule of Davis v. United States, *supra*, since 1895, and have not found it a handicap in effecting criminal justice. In my view, when sanity is in issue, the burden of persuasion should be upon the prosecution to establish the sanity of the accused beyond a reasonable doubt.

### III

In fairness, to avoid surprise, the prosecution should be entitled to notice that it must adduce evidence of the defendant's sanity. Because the mental status of an accused, in terms of sanity, is usually not in issue in a criminal prosecution, it would be an unfair burden to require the state invariably to guess at whether this issue might be raised at trial, and possibly to prepare on this issue, only to have it not raised at all. Nor is it fair for defendants to wait in ambush until trial to inject the sanity issue as a surprise tactic.

Therefore, if we were to alter our insanity rules, we should also change our procedural rules to require that at the time of plea, or within a certain number of days thereafter, one intending to raise the issue of insanity at his trial must specially plead that he was insane at the time he committed the act charged.

For the reasons given I would reverse and remand for a new trial.

---

**26.** As a practical matter the accused often must undertake to adduce proof of insanity if he is to prevail in creating a reasonable doubt on the whole evidence.